Filed 5/29/24  P. v. Perkins CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C096468 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2015-0007403) |
| v. | |
| SHAUN TERRIEL PERKINS, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

On the afternoon of August 24, 2015, defendant Shaun Terriel Perkins stole Danny Coffey's car.  When defendant stole the car, Marlene McGehee's unloaded gun and a sealed bag of ammunition were in the trunk.  We note that Coffey and McGehee are now deceased.

That night, between 10:17 p.m. and 10:20 p.m., defendant drove through the intersection of South Hunter and East Church Streets in Stockton, pulled over and, using

the gun that had been in the trunk of the car, shot and killed Marcelino Urbina. The next morning, August 25th, defendant abandoned the car but kept the gun. That afternoon, defendant went to a homeless center located less than a block from South Hunter and East Church Streets. There, he confronted one of the center's residents, A.T., who thought defendant wanted something, likely money. When the confrontation between defendant and A.T. escalated, defendant put a gun close to A.T.'s face. As A.T. fled, defendant fired the gun in his direction. Police responded to the resulting 9-1-1 call and arrested defendant.

A jury convicted defendant of the misdemeanor unlawful taking of Coffey's vehicle, the misdemeanor grand theft of McGehee's firearm, the felony attempted robbery of A.T., the assault of A.T. with a firearm, and of being a prohibited person in possession of a firearm. That jury was unable to reach a verdict on the charge that defendant murdered Urbina, and the court declared a mistrial on the charge.

The court held a second trial, and at that trial, the jury found defendant guilty of the first degree murder of Urbina.

Based on the guilty verdicts, various enhancement findings by the juries, and on its own findings regarding defendant's prior convictions, the trial court sentenced defendant to a determinate term of 26 years to life and an indeterminate term of 75 years to life. Included in defendant's sentence were six-month concurrent terms for each of the two misdemeanor convictions.

On appeal, defendant makes seven claims. First, he argues that based on embellishments the trial court made to the jury instruction it provided both juries on the issue of reasonable doubt, all the verdicts at both trials must be reversed. Second, he argues the trial court erred in dismissing two jurors during the first trial. Third, he argues there was insufficient evidence to support the first jury's attempted robbery verdict. Fourth, he argues his conviction for assault with a firearm must be reversed due to embellishments the trial court made to the jury instruction for that offense during the first

trial. Fifth, he argues he was improperly convicted and sentenced for both the taking of the vehicle and the theft of the gun because both thefts were accomplished in one act. Sixth, he argues that there was insufficient evidence during the second trial to support a finding that the murder of Urbina was deliberate and premeditated. Seventh, he argues the abstract of judgment incorrectly identifies his murder conviction as one for "felony murder."

We affirm the trial court's judgment, but order the trial court to correct the abstract of judgment to identify the murder conviction as one for "first degree murder" and not "felony murder."

## FACTS AND HISTORY OF THE PROCEEDINGS

### Facts

We present the facts in chronological order. When we describe the evidence related to the Urbina killing, we refer to evidence presented at the second trial. When we describe the confrontation between defendant and A.T., we refer to evidence presented at the first trial.

### The Theft of the Corsica and the Gun

At each trial, the court reporter read the testimony of Coffey and McGehee at the preliminary hearing. According to their testimony, on August 24, 2015, brother and sister McGehee and Coffey were planning to go to the shooting range to fire her .40 caliber Smith and Wesson handgun. They later were side-tracked and did not go to the firing range. In anticipation of the trip to the gun range, Coffey had put the gun in the trunk of his Chevy Corsica. The gun was unloaded and in an unlocked metal box. There was a full, unopened plastic bag containing 100 rounds of ammunition in the trunk.

Around noon, Coffey drove to a friend's. He left the car in front of his friend's apartment, with the car unlocked and his keys in the ashtray. Coffey and his friend left

3

for about 20 to 30 minutes, and when they returned Coffey's car was gone. His friend gave him a ride to McGehee's where he called the police.

### The Murder at Church and Hunter

There is a restaurant called Dos Hermanos on the northeast corner of South Hunter and East Church Streets in Stockton. South Hunter runs north and south, and East Church runs east and west. There is an empty parking lot on the northwest corner of the intersection of South Hunter and East Church Streets which parking lot is immediately west of Dos Hermanos.

Local residents testified that at approximately 9:30 p.m. or 10 p.m. on August 24, 2015, they heard multiple gun shots coming from the direction of Dos Hermanos.

R.M. and I.M. lived on the 100 block of East Church Street, roughly one block west of East Church and South Hunter. Immediately after he heard the shots, I.M. looked out a window. And, about 20 seconds after he heard the shots, he saw a vehicle coming from South Hunter and going towards El Dorado Street, which is a block west of South Hunter. He was not sure if it was a van or a car. It was dark outside, and the car looked dark. He thought the car was going fast for where it was and that he heard it speed up.

R.M. went to stand by the gate in front of her home and looked towards South Hunter and East Church. R.M. testified she saw a commotion on the corner, and some people standing over a body. She testified she thought she heard a person speaking Spanish, and that person seemed shocked about what had just happened. She testified she heard a car "rev" its engine, but she did not see people get into it. She believes the victim would have been on the sidewalk near the empty lot or on the curb. R.M. explained that the area of South Hunter Street and East Church Street was where farmworkers would often get picked up early in the morning and then hang out after work. She said, "there was always people there, workers."

4

R.M. testified she heard a car come from the direction of South Hunter and East Church, and it sped past her house. It was a smaller, older sedan. The car turned north onto El Dorado without stopping at the stop sign.

Z.V. was six and living on South Hunter Street. About a minute or two after she heard gun shots, she looked through her door onto South Hunter Street and saw a car going by very fast. It was dark, and she could not see the color of the car, but it looked like a four-door car. It was going in a direction away from Dos Hermanos.

At around 2:30 a.m. on August 25, 2015, H.G., co-owner of Dos Hermanos, arrived at the restaurant, which was his practice because he would open around 3 or 3:30 a.m. to sell food to field workers. Someone asked him to call an ambulance because there had been blood on the ground, and there was a man who had been lying there a long time who was not responsive. H.G. went in the restaurant and called for an ambulance. He recognized the man on the ground as "Mars" who lived in the second house from where he was lying.

Officers who arrived testified they found the victim to be cold, stiff, and nonresponsive and they could not find a pulse. The body was on the west sidewalk of South Hunter Street near the parking lot across from Dos Hermanos, approximately 70 feet from East Church Street, and lying face down. Paramedics declared the victim dead. The victim's feet faced East Church. A trail of ants led to an area where there was blood under the victim's face. There were blood stains on the victim's lower back and a puncture wound near his lower belt line. Officers were unable to locate a cellphone, wallet, or identification card on the victim, but one officer was able to use a hospital band to identify the victim as Urbina, who lived near where he was found.

A paramedic gave a similar description of Urbina's condition, noting that the body had rigor.

One officer testified he found a Speer .40 caliber bullet casing on the north side of East Church where it meets South Hunter, roughly 60 feet from the body.

5

The evidence technician who arrived at 2:55 a.m. testified that the shell casing located at the northwest corner of East Church and South Hunter on the edge of the sidewalk was a Speer .40 caliber Smith and Wesson casing. He said that another officer pointed to a defect in a fence located at 427 South Hunter Street, which is separated from the empty lot by a wood fence. He also noted a bullet hole in a stop sign on the northwest corner of South Hunter and East Church. He could not say if the hole had anything to do with this shooting.

The doctor who performed the autopsy on Urbina testified that Urbina's cause of death was a gunshot wound from a .40, .45, or 9-mm caliber bullet, which had caused massive internal bleeding. He testified that Urbina had been shot from behind, at a distance of greater than two to three feet, and that either the muzzle of the gun was lower than the lower-back entry wound or Urbina was bending over when he was shot. The doctor also believed Urbina's wound was consistent with a gun being shot at his back from the right of his back. The bullet passed through Urbina's body and perforated his spinal cord, causing him to fall immediately. Urbina was 83.

### Video Surveillance Footage

Detective Alaniz, the lead detective on the case, obtained video footage from surveillance cameras at Dos Hermanos and testified regarding what those videos showed.

One video clip lasted 19 seconds and ended at approximately 10:18:31 p.m. He testified the video showed a vehicle driving east—though based on later testimony, it appears he meant west—then pulling over slightly in front of a rescue mission about one-half block away before moving along.

Another outside camera pointed south and captured a view of the intersection of South Hunter and East Church. This video clip began at 10:18:25 p.m. and ended at 10:18:33 p.m. It showed a car crossing the intersection, its brake lights going on, and the car going out of view. It appeared that the car pulled over to the curb.

6

Another outside camera pointed west and gave a view of the intersection of East Church and South Hunter. A clip from that camera that began at 10:18:17 p.m. shows the vehicle going west then, at 29 seconds into the clip (10:18:46 p.m.), the driver had crossed South Hunter Street, stepped on the car's brake, and pulled over. The car stopped, and all its lights went out. The lights went out at approximately 10:18:40 p.m. Alaniz noted the taillights were unique and, having looked at the Corsica, he believed it was the same car. The video ended at 10:19:52 p.m. Before the video ends, the brake lights or taillights came back on at about 10:19:50 p.m. The car left, and Detective Alaniz believes it went north. Up ahead of where the car pulled over, and going in a north direction, was a spot where Hazelton and El Dorado merged.

The jury was shown a photograph of the Corsica.

Detective Alaniz also reviewed surveillance footage taken from inside Dos Hermanos which footage had audio. The clip he reviewed began at about 10:19:27 p.m. and ends at 10:19:42 p.m. Alaniz testified that in the video, you hear one gunshot, then an eight-second pause, then four more gunshots. The first shot was fired at approximately 10:19:31 p.m. When asked if he could hear people talking on the video, Detective Alaniz said, "[y]es," then clarified, "[y]ou could hear like—you couldn't distinctly tell that it was words, but you could tell there was something going on outside." And he said, "[n]o" when asked if he heard yelling, a commotion, or something like that.

Considering the video clips together, Detective Alaniz testified that he determined that the taillights on the car were off for approximately 50 seconds before the first gunshot. He testified the car's brake light went back on about 12 seconds after the last gunshot.

In the footage he watched, it did not appear to Detective Alaniz that a lot of people were around near the time of the gunshots. However, he testified, given his general knowledge of the area, "there was [*sic*] always people walking around late at night," and that it is a high crime area. He did not see any other car that could be associated with the

7

gunshots in the timeframe of the shooting. The cameras did not show Urbina's body or the shooting.

Further Investigation at the Location of the Murder

Detective Alaniz and an evidence technician later searched the area of 127 East Church Street, near where Urbina was shot. According to the evidence technician, they found four .40 caliber cartridge casings on the side of the road. The casings were located to the east side of the property located at 127 East Church Street, near the north curb line of East Church Street.

Country Market Video Footage

Detective Alaniz reviewed footage taken at the Country Market the night of August 24, 2015, and testified regarding that footage at both trials.

Between 11:03 p.m. and 11:05 p.m. on August 24, 2015, defendant was seen on surveillance cameras pulling up to a gas pump in the gas station which was part of the Country Market in Stockton. Defendant went into the store where he made a purchase.

Defendant returned to the car and drove away, leaving at approximately 11:12 or 11:13 p.m. Alaniz testified the taillights on the car were similar to the taillights captured in footage from the location of Urbina's murder.

Recovery of the Corsica

On August 25, 2015, at 5:30 a.m., P.E. returned to the apartment complex where she lived and found another car parked in her assigned parking space. A man matching defendant's race wearing clothing she described as similar to the clothes defendant was wearing in the Country Market video got out of the car. When P.E. asked the man to move the car, he told her he could not move the car because it was not his, and that she could do what she wanted with the car like he was going to gift it to her or she could sell it. P.E. went to her apartment and called the police.

8

An officer sent to P.E.'s building checked the plates on the car and identified it as Coffey's stolen Chevy Corsica.

Coffey went to P.E.'s apartment building and retrieved his car. The interior of the car was a mess and contained items that did not belong to Coffey. Coffey put those items in a garbage bag in the trunk. Coffey realized the gun was missing later, when the police came to speak with him at McGehee's house.

When detectives, including Detective Alaniz, and an evidence technician went to look at items Coffey had stored in the bag, a .40 caliber bullet casing fell out when they opened the trunk of the car. The detectives took items that did not belong to Coffey, including a receipt for the Country Market, time stamped 11:10 p.m. on August 24, 2015.

A DNA test of a plastic cigar tip found in the Corsica yielded a DNA profile that matched defendant. The DNA profile is estimated to occur at random among unrelated individuals in approximately one in 16 quintillion African Americans.

A swab from the e-cigarette butt found in the Corsica yielded a mixture of DNA from two people. Defendant was excluded from being a contributor to the mixture of DNA on that e-cigarette butt.

### The Incident at the Mission

The Gospel Rescue Mission (the mission) is a homeless outreach center about a half block east of Dos Hermanos.

On August 25, 2015, L.S. was working as a receptionist at the mission. The mission provides services for homeless and lower income persons in the area, including a residential drug and alcohol program, and overnight shelter for homeless men. At approximately 3:30 p.m., she was working in an office when they heard gun shots from the courtyard of the mission, and she called 9-1-1. She could not tell exactly where the shots were coming from. She heard one shot.

9

The court reporter read A.T.'s testimony from the preliminary hearing at both trials.

A.T. testified at the preliminary hearing that on a Tuesday morning in August, he was walking to the mission. When asked if someone confronted him that day, A.T. responded "[y]es . . . but it wasn't this guy." He said some guy tried to hit him with a gun, that he didn't remember, and he had been drinking.

When asked if someone came up to him who wanted food or money, A.T. responded they "wanted something," and they "shot a blank or something." When asked to clarify about the blank, A.T. said he got hit in the arm but did not have a wound.

A.T. testified he did not want to go to court to talk about this and did not really know what he was doing in court.

A.T. testified regarding the man who approached him that, "I think he was just being a jerk, you know." A.T. said he was not frightened when the man came up to him, but he was frightened after the gunshot.

A.T. admitted at one point he threw water at the man with the gun to try to get him to "change his mind." A.T. testified the man pulled a gun out after he threw water on the man. But, later, when asked if he saw the gun when he first started talking to the man, A.T. said, "[h]e pulled the gun and tried to put it in my face right away." When asked if the man was asking for money or food when he pulled out the gun, A.T. responded, "[h]e asked me for money right away. I don't know." Later, on cross-examination, when asked if the person asked for money or food, A.T. responded, "[n]o. Just being a fool."

A.T. said, "I threw water. I hit the corner. He fired a shot. Police come. They check my elbow. I told them I don't want no charges. They leave."

A.T. said the person he had a confrontation with didn't look like defendant at all. He said the man looked more African and dirtier, while defendant looked more clean-cut. The other guy looked "more cheek bones, more skinny, more like he's been on the street

10

longer, sleeping on the ground or something." A.T. said the guy had darker skin color; very dark black.

On cross-examination, counsel asked A.T. if he argued when the guy asked for food, A.T. said, "Yeah. Yeah. I already backed a little bit. I was – I was in a bad mood." A.T. said he did not take off running after he threw the water. But "I hit the corner, like I was trying to get out of the way. I knew he was going to shoot."

A.T. testified he did not see the person shoot at him. He agreed he did not see the man shoot because he had his back turned. He heard one or two gunshots.

The court reporter read Peter Duckworth's testimony from the preliminary hearing because he was deceased at the time of trial.

According to Duckworth's testimony, on the afternoon of August 25, 2015, he was in the courtyard of the mission. He heard a loud bang. Then A.T. and defendant came into the courtyard, with defendant trailing A.T. by about seven to 10 feet. Defendant had a gun, which he was carrying down by his side. Duckworth had not seen defendant around the mission before. The men did not speak to Duckworth. Duckworth said, "gun" loudly and went into an office around the corner. About a minute-and-a-half later, A.T. entered the office. Duckworth saw A.T. holding his elbow as if it was sore and complaining about something stinging his arm. Duckworth did not see blood on A.T.

About five to 10 minutes after he saw defendant enter the courtyard, Duckworth saw defendant on a bike on Church Street.

B.K. was the chief operating officer for the mission. He testified that A.T. was not really "all there." He believes A.T. has a severe mental illness or a developmental disability. A.T. stayed at the mission from time to time, though at the time of trial B.K. had not seen A.T. in a long time.

On August 25, 2015, at approximately 3:30 p.m. B.K. called 9-1-1 after somebody told him there was someone in the courtyard with a gun. B.K. does not recall hearing a shot. He went to the kitchen and looked out windows—where you can see most of the

11

courtyard—to see if it was safe, and he did not see anyone with a gun. When he went to the courtyard and went out the gate, Duckworth followed him. He was on the 9-1-1 call when Duckworth identified someone. The man appeared to be a black man on a bicycle. He thinks L.S. or Duckworth likely told him about the gunshot, which he does not remember hearing.

The transcript from B.K.'s 9-1-1 call shows he called 9-1-1 at 3:33 p.m. B.K. testified he spoke with A.T. while he was on the call. On the transcript, B.K. asks "[d]id he shoot you or what?" A man who identified himself as A.T. responded, "[h]e tried to and it hit my arm. Did it?" B.K. responded, "your arms are pretty red, but it don't look like no bullet hole."

When officers arrived in the area to investigate and look for defendant, Officer Justin Bauer met with A.T. around the corner of the mission. A.T. was very scared and did not want to be there and was not fully cooperative. Officer Bauer did not see any injuries on A.T. A.T. made a statement that a metal railing in the front of the mission scratched him. Officer Bauer looked at some railing near the entrance and saw some damage that seemed pretty fresh. He identified what he believed was a recent chip in the paint. He directed field evidence technicians to look at the area for possible damage from a gunshot. Bauer found a shell casing near the front of the mission. The evidence technician said the casing was a S&W .40 caliber Speer Casing.

### Defendant's Arrest

Officers were sent to the area of the mission shortly after the 9-1-1 calls were made. They found defendant nearby riding a bicycle. Officers found a gun with a loaded magazine on defendant as well as an additional magazine. An officer checked the serial number for the gun and determined it was registered to McGehee, which the officer later confirmed with McGehee.

A cell phone was also taken from defendant.

12

### Casings Analysis

Detective Alaniz testified that he sent a magazine, firearm, and seven shell casings—one from the trunk of the car, one from the mission, and five from the scene of the homicide—to the Department of Justice to see if the casings were fired from the gun.

A senior criminalist for the department testified that the casings were .40 Smith and Wesson caliber. All the casings had characteristics that would lead her to believe they could have been fired from the same firearm. She also test-fired the firearm six times. She concluded that the seven casings collected were fired from McGehee's gun.

The criminalist also testified that, given the configuration of the gun, fired casings will generally go to the right and rear of the shooter. She also testified that the gun was a semi-automatic, which meant it would fire one bullet with each trigger pull, and that she had needed to apply six pounds of pressure to pull the trigger on the gun.

### Cell Phone Record Analysis

The People called as a witness an expert in cellular communications to discuss the cell phone records from the cell phone found on defendant at the time of his arrest.

According to the expert, at 2:11 p.m. on August 24, 2015, when the Corsica was stolen, there was no activity. However, calls at 2:47 p.m. and 2:55 p.m. connected to a cell site that appears to include the location where the vehicle was stolen. Beginning at around 10 p.m., the data shows the phone moving in a southern direction, towards the homicide area. Then at 10:15 p.m. and 10:17 p.m. it connected to a cell site that includes the area of homicide. The 10:17 p.m. connection was two minutes before the gunshot audio was captured. The phone next connected to a cell cite again at 10:28 p.m.

Starting at 11:13 p.m., the phone connected to the cell site nearest the Country Market. It continued to connect to that cell site until 12:05 a.m. on August 25, 2015. Then, at 1:07 a.m., it connected back with a cell site near the homicide. It again connected with the cell site near Country Market at 1:19 a.m.

The phone connected to a cell site at 10:40 a.m., 11:30 a.m., and 11:35 a.m. on August 25, 2015, that includes the area where the vehicle was recovered.

The phone records reflected the phone communicating with individuals who visited defendant while he was in county jail.

### "I did it"

Detective Alaniz testified to obtaining a search warrant to collect DNA from defendant. In November 2015, he went with another detective to meet defendant in the county jail. According to Detective Alaniz, when he provided a copy of the search warrant to defendant, defendant said, "I don't want to waste your time. I did it." Detective Alaniz then collected DNA samples. The interaction was not recorded because Detective Alaniz was strictly there to collect defendant's DNA.

### Proceedings

The operative information sets forth six counts.

After the first trial, a jury found defendant guilty of Count Two, the misdemeanor unlawful taking of Coffey's vehicle, in violation of Vehicle Code section 10851, subdivision (a).

The first jury found defendant guilty of Count Three, the misdemeanor grand theft of McGehee's firearm, in violation of Penal Code section 487, subdivision (d)(2). (Undesignated section references are to the Penal Code.)

The first jury found defendant guilty of Count Four, the felony attempted robbery of A.T., in violation of sections 664 and 221. The first jury found true enhancement allegations that defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a), when he committed Count Four.

14

The first jury found defendant guilty of Count Five, the assault of A.T. with a firearm in violation of section 245, subdivision (a)(2). The jury found true the enhancement allegation that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a), when he committed Count Five.

The first jury found defendant guilty of Count Six, the possession of a firearm by a prohibited person in violation of section 29800, subdivision (a)(1).

The first jury was unable to reach a verdict on Count One, which accused defendant of the first degree murder of Urbina. The trial court declared a mistrial on Count One.

Following a second trial, the jury found defendant guilty of Count One, the first degree murder of Urbina. The second jury found true enhancement allegations that in the commission of Count One, defendant intentionally and personally discharged a firearm resulting in death, within the meaning of section 12022.53, subdivision (d), and that he personally used a firearm, within the meaning of section 12022.5, subdivision (a).

At a bifurcated trial, the trial court found true the enhancement allegation that defendant had a prior strike conviction under sections 1170.12, subdivision (b), and 667, subdivision (d).

The trial court pronounced its sentence on May 31, 2022. On Count One for first degree murder (§ 187, subd. (a)), applying the strike enhancement, the trial court sentenced defendant to 50 years to life. The trial court then added an enhancement of 25 years to life for the section 12022.53, subdivision (d), enhancement and stayed the sentence for the section 12022.5, subdivision (a), enhancement. Thus, the trial court imposed an unstayed term of 75 years to life on Count One.

The trial court imposed six-month concurrent sentences on Counts Two (§ 10851, vehicle taking) and Three (§ 457, subd. (b)(2)).

The trial court sentenced defendant to the upper term of six years on Count Four, attempted second-degree robbery (§§ 211 & 664) with a consecutive 20-year term for the

15

section 12022.53, subdivision (c), enhancement, for a total determinate term of 26 years. The court imposed but stayed a 16-month enhancement to Count Four under sections 12022.5, subdivision (a), and 12022.53, subdivision (f).

On Count Five, for assault with a firearm (§ 245, subd. (a)(2)), the trial court imposed an upper-term sentence and doubled it due to the strike finding assessing a penalty of eight years. The trial court stayed the sentence on this count under section 654.

On Count Six, for being a prohibited person in possession of a firearm (§ 29800, subd. (a)(1)), the trial court imposed an upper-term sentence and doubled it due to the strike finding assessing a penalty of six years. The trial court stayed the sentence on this count under section 654.

In total, the trial court ordered defendant to serve a determinate term of 26 years, and an indeterminate term of 75 years to life, with the indeterminate term to be served consecutive to and following the determinate term. The trial court also imposed various fines and fees and awarded defendant 2,394 days credit for time served.

Defendant filed a notice of appeal on June 23, 2022.

DISCUSSION

I

*Instruction on Reasonable Doubt*

Defendant argues that the jury was incorrectly instructed on the standard of proof beyond a reasonable doubt at both trials, and, therefore, that the verdicts on all counts must be reversed. He takes particular issue with the trial court's defining the word "abiding" to mean "lasting," claiming the definition failed to convey how deeply jurors must be convinced of a defendant's guilt before finding a defendant guilty. Defendant is not entitled to reversal based on the court's instructions regarding reasonable doubt.

16

A.    Additional Background

At both trials, the court instructed the jury with CALCRIM No. 220 which explains the concept of proof beyond a reasonable doubt.

As given in both trials, the written version of CALCRIM No. 220 states, in part:

"A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise].

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant[s] guilty beyond a reasonable doubt, [they are] entitled to an acquittal and you must find [them] not guilty."

In reciting CALCRIM No. 220 orally to the jury, at both trials, the trial court added some language to the first and second paragraphs (the subject text) of the instruction.  In the following sections, which describe changes the trial court made to the subject text in reading it aloud, changes and embellishments are indicated by italics.

1.    Changes to the Instructions in the First Trial

In the first trial, the trial court said the following when going over the subject text:

"A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

17

"Proof beyond a reasonable doubt is proof–*what is it, guys?  It*'s proof that leaves you *in your mind as a juror* with an abiding conviction that the charge is true.  *Now, the only other expansion or definition—abiding means a lasting conviction, not something where it's two minutes to 12:00 and we want to go eat.  Well, go with it.  Fine.  I don't know, let's go.  It's a lasting conviction, okay, of the truth of the charge.*  [¶]  The evidence need not eliminate all possible doubt, *and both lawyers talked about this*, because everything in life is open to some possible or imaginary doubt."

### 2.  Changes to the Instructions in the Second Trial

In the second trial, the court said the following when reading the subject text:

"A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.  *And that's in this case.  There's some cases with different burdens for different issues.  This is not a sex or elder abuse case.*

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  *That's the only definition I can give you.  Used in all 58 counties in the state.  We don't have different ones in San Diego and different ones in Siskiyou.  The only expansion is when I say it leaves you with an abiding conviction, that's a lasting conviction.  That's the definition.*  [¶]  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

The court also did not use the phrase "unless I specifically tell you otherwise" in its oral recitation of the subject text in the second trial.

Additionally, in the second trial, the court began its oral recitation regarding the meaning of reasonable doubt by saying, "[w]e all talk about reasonable doubt.  What is it?  I mentioned it when we picked you.  It's a brief reference because there's a lot going on."

At the beginning of the trial, the court had stated, "[b]eyond a reasonable doubt means this, sometimes young lawyers in picking a jury say, well, Mr. Jones, what does beyond a reasonable doubt mean to you?  I always stop them because it's not relevant. The only relevancy is what is the standard.  The standard we're using in this case and all criminal cases, beyond a reasonable doubt means this:  At the end of the case you look at the totality, all the evidence, not just the first witness or last.  You look at it all and do you have an abiding conviction of the truth of the charge?  Abiding means lasting."

B.  Standards and Principles of Review for Jury Instruction Challenges

"We review a claim of instructional error de novo."  (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)  We determine the correctness of jury instructions by looking at the entire charge of the court, and not from isolated parts of an instruction or from a particular instruction.  (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)  "We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation . . . ."  (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)  When erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written ones.  (See *People v. Grimes* (2016) 1 Cal.5th 698, 729.)  This is notably true when a jury is instructed to be governed only by instructions in their final wording.  (*Ibid.*)

C.    Analysis

1.    Principles Regarding Reasonable Doubt Instructions

The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects a defendant, "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  (*In re Winship* (1970) 397 U.S. 358, 364 (*Winship*); *Jackson v. Virginia* (1979) 443 U.S. 307, 315-316; see also *People v. Aranda* (2012) 55 Cal.4th 342, 349 (*Aranda*).) "[T]he reasonable-doubt standard is indispensable, for it 'impresses on the trier of fact the

19

necessity of reaching a subjective state of certitude of the facts in issue.' [Citation.]" (*Winship*, at p. 364.) "[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." (*Victor v. Neb.* (1994) 511 U.S. 1, 22 (*Victor*).)

When a trial court provides a jury instruction that lowers the reasonable doubt standard, reversal is required. (See *Aranda*, *supra*, 55 Cal.4th at p. 365.) "An instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error because it 'vitiates all the jury's findings' and its effect on the verdict is 'necessarily unquantifiable and indeterminate.' (*Sullivan*[ *v. Louisiana* (1993)] 508 U.S. [275,] 281, 282; see *Hedgpeth v. Pulido*[ (2008)] 555 U.S. [57,] 61 ['harmless-error analysis applies to instructional errors so long as the error at issue does not categorically " 'vitiat[e] all the jury's findings' " '].)" (*Aranda*, *supra*, 55 Cal.4th at p. 365, italics omitted.) But not every error related to providing instruction on the reasonable doubt standard is structural, and some errors remain subject to harmless error review. (See *id.* at pp. 365-366.)

To determine whether the error is structural, "we ask whether the error rendered the *trial* 'fundamentally unfair or an unreliable vehicle for determining guilt or innocence' [citation], or whether the effect of the error is 'necessarily unquantifiable and indeterminate' (*Sullivan*, *supra*, 508 U.S. at p. 282)." (*Aranda*, *supra*, 55 Cal.4th at p. 366.) To make this assessment, we ask, " 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof. ([*Victor*, *supra*, 511 U.S.] at p. 6.)" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 840 (*Daveggio and Michaud*); see also *People v. Potts* (2019) 6 Cal.5th 1012, 1032-1033 (*Potts*).)

The Constitution does not require particular words in instructing the jury on the burden of proof, but " '*taken as a whole*, the instructions [must] correctly convey the

concept of reasonable doubt to the jury.'  [(*Holland v. United States*, 348 U.S. 121, 140, 99 L. Ed. 150, 75 S. Ct. 127 (1954).)]"  (*Victor*, *supra*, 511 U.S. at p. 5, italics added.)

In California, the Legislature has codified the reasonable doubt standard.  Section 1096 states, "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him or her guilty beyond a reasonable doubt.  Reasonable doubt is defined as follows:  'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "

Additionally, section 1096a provides that, "[i]n charging a jury, the court may read to the jury Section 1096, and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given."

### 2.  Use of the Word "Lasting"

Here, defendant complains that in both the first and second trial the court erred in instructing the jury that the word "abiding" means lasting.  But our Supreme Court has recognized that an abiding conviction is one of a "lasting, permanent nature."  (See *People v. Brigham* (1979) 25 Cal.3d 283, 290 (*Brigham*).)  Thus, the court's explanation that the term "abiding" means "lasting" was an accurate statement of the law.

Defendant maintains that in defining the term abiding to mean "lasting" the court improperly diluted the definition by excluding a requirement regarding how strongly and deeply the conviction must be felt.  Defendant argues that in *Brigham*, *supra*, 25 Cal.3d at pages 290-291, the Court explained that the term abiding has both a temporal component and "intensity component."  That is, defendant argues that abiding is meant to

21

convey both (1) how strongly and deeply a conviction must be held; and (2) that the conviction must be lasting and permanent. And, he reasons, by defining "abiding" to mean "lasting," the trial court eliminated the need for a "subjective state of near certitude" from the reasonable doubt standard. (See *Winship*, *supra*, 397 U.S. at p. 364.) This argument takes the cited language from *Brigham* out of context and ignores the common understanding of the word "abiding."

In *Brigham*, *supra*, 25 Cal.3d at page 290, footnote 8, the Court considered the continuing viability of an instruction in which (1) the term "abiding" was not used; and (2) the instruction simply told the jury that the requisite proof was "that degree of proof which produces conviction in an unprejudiced mind." The Court explained the instruction without the term abiding was not sufficient because, "[t]he lasting, permanent nature of the conviction connoted by 'abiding' is missing and the juror is not informed as to how strongly and how deeply his conviction must be held." (*Id.* at pp. 290-291.) Defendant's argument reads *Brigham* as if the Court ascribed the term "abiding" with a two-pronged definition, where both prongs are essential, and the term "lasting" is insufficient to convey that the conviction must be deeply felt. We do not read the text this way. Rather, we read *Brigham* to convey that the term "abiding" is essential because it means "lasting, permanent," and without knowing the "lasting, permanent" nature of the conviction required to enter a finding of guilt, the jury is not sufficiently instructed on how deeply the conviction must be held. That is, the "intensity component" to which defendant refers is not independent of the "lasting" nature of an abiding conviction. Rather, the need for the "intensity component" is conveyed by the need for the conviction to be "lasting, permanent" i.e., abiding.

Defining the term "abiding" to mean "lasting," and interpreting *Brigham* this way, is consistent with a common understanding of "abiding" as found in the dictionaries. For example, the Fourth Edition American Heritage Dictionary (2007) at page 3 defines the term abiding as "[l]asting for a long time; enduring." Similarly, Merriam-Webster's

22

Eleventh Edition Collegiate Dictionary (2006) at page 2 defines "abiding" as "enduring, continuing." (All caps removed.) Thus, there is nothing in the trial court's use of the term "lasting" in explaining proof beyond a reasonable doubt that would lead jurors to conclude that their belief in defendant's guilt must be anything less than "abiding."

The other cases defendant cites in support of his argument do not persuade us that defining "abiding" to mean "lasting" was incorrect or otherwise diluted the standard by removing the requirement of a subjective state of near certitude. (See *Jackson v. Virginia, supra,* 443 U.S. at p. 315 [the reasonable doubt standard impresses "upon the factfinder the need to reach a subjective state of near certitude"]; *Victor*, *supra*, 511 U.S. at pp. 14-15 ["An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof. [(*Hopt v. Utah*[ (1887)] 120 U.S. [430, ]439)] ('The word "abiding" here has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence' ")]; *People v. Pierce* (2009) 172 Cal.App.4th 567, 573 ["The United States Supreme Court and the California Supreme Court, respectively, have described 'an abiding conviction' as one that is 'settled and fixed' (*Hopt v. Utah*[*, supra*] 120 U.S. [at p.] 439 []) and one that is 'lasting [and] permanent' ([*Brigham, supra,*] 25 Cal.3d [at p. 290] [])"]; *People v. Freeman* (1994) 8 Cal.4th 450, 503, 505 [observing that "[t]he trial court used the phrase 'an abiding conviction' that the high court held saved the standard instruction" in an opinion that was more concerned with the meaning of the terms "moral evidence" and "moral certainty"]; see also *People v. Muniz* (2011) 2011 Cal.LEXIS 12603 [granting review of and thereby superseding *People v. Muniz* (2011) 198 Cal.App.4th 1324].)

It is true that in *People v. Zepeda* (2008) 167 Cal.App.4th 25, 30-31, this court found that the "[u]se of the term 'abiding' tells the juror his conviction must be of a 'lasting, permanent nature,' and it informs him 'as to how strongly and how *deeply* his conviction must be held.' ([*Brigham, supra,*] 25 Cal.3d [at pp.] 290–291 [], italics added,

23

fn. omitted.)" Likewise in *People v. Light* (1996) 44 Cal.App.4th 879, 885, the Fifth District Court of Appeal described *Brigham*'s language regarding the import of the term "abiding" by stating, " 'abiding conviction' was found to adequately convey the requirement that the jurors' belief in the truth of the charge must be both long lasting and deeply felt." But neither of these cases finds that the "lasting" nature of a conviction that is conveyed when one refers to an "abiding conviction" is not what also conveys that it is a deeply felt conviction. That is, neither suggests there is something about the word "abiding" as used in jury instructions—which is *in addition to* a common, dictionary definition of the word—that describes a certain depth of feeling.

### 3. Additional Language in the First Trial

With respect to the reasonable doubt instruction given in the first trial, defendant also takes issue with the trial court's amorphous adlibbed language in which it said an abiding conviction is, "not something where it's two minutes to 12:00 and we want to go eat. Well, go with it. Fine. I don't know, let's go."

It has been written that "California trial (and appellate) judges know that, at least initially, no further instruction on the subject of reasonable doubt need be given beyond that [set forth in [] section1096a], that 'individual courts should not . . . modify the standard instruction' (*People v. Freeman*, *supra*, 8 Cal.4th at p. 504), and that to further instruct on the concept of a reasonable doubt is 'perilous' (*id.* at p. 504)." (*People v. Pierce, supra,* 172 Cal.App.4th at p. 578 (conc. opn. of Hull, J.).) Put differently, a trial judge walks a fine line between affirmance and reversal when the judge decides to adlib on the concept of reasonable doubt. If the judge errs, the entire trial may become a nullity.

We can only speculate as to what the trial court hoped to impart to the jury with this additional casual language, although we can guess it had to do with the concept of an "abiding" conviction. But whatever it was, we would strongly advise the trial court to

24

refrain from such adlibbing in the oral delivery of the CALCRIM instructions which have been written and adopted after considerable and careful study (see, *Judicial Council of California Criminal Jury Instructions* (2024), Preface, and Guide for Using Judicial Council of California Criminal Jury instructions (2024)), particularly, when giving the instructions on the concept of reasonable doubt. To do otherwise is "perilous" indeed.

Nonetheless, we do not find it reasonably likely that the jury understood this remark to lower the People's burden of proof. (See *Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 840.) It was an apparent attempt to tell the jury what an "abiding conviction" is not. Nor do we find it comparable to the cases cited by defendant that trivialize the concept of an "abiding conviction" or those where courts or prosecutors have equated reasonable doubt determinations to the analysis one might apply to make decisions in their own lives. (See *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1172 [noting people may get on airplanes and plan vacations even though have some reasonable doubt, and concluding, "[w]e are not prepared to say that people planning vacations or scheduling flights engage in a deliberative process to the depth required of jurors or that such people finalize their plans only after persuading themselves that they have an abiding conviction of the wisdom of the endeavor"]; *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 ["The prosecutor's argument that people apply a reasonable doubt standard 'every day' and that it is the same standard people customarily use in deciding whether to change lanes trivializes the reasonable doubt standard. . . . The marriage example is also misleading since the decision to marry is often based on a standard far less than reasonable doubt . . . ."].)

### 4. Additional Language in the Second Trial

With respect to the second trial, in addition to taking issue with the trial court's use of the word "lasting" to define abiding, defendant also takes issue with other language the trial court adlibbed at the beginning of the trial and while giving the

25

instructions to the jury. First, defendant points to the language at the beginning, where the court (1) explained it disallows questions of the jurors about what a reasonable doubt is, because the "only relevancy is what is the standard"; (2) defined the standard as "an abiding conviction of the truth of the charge"; and (3) said, "[a]biding means lasting." Second, defendant notes adlibbed language in the delivery of the reasonable doubt standard, in which the court explained that the standard applied in all counties of the state.

Defendant argues that the impact of these comments was to tell the jurors to "put aside what proof beyond a reasonable doubt means to them personally and decide the case according to an objective statewide standard that only requires a 'lasting' conviction. Their subjective feelings on that matter were said to be irrelevant." Defendant argues that the impact of this is that—in addition to conveying that the standard relies on a "lasting conviction"—jurors would believe they are required to put aside their own understanding of what a reasonable doubt is *and* that the standard does not require a "subjective state of near certitude."

This argument is unpersuasive. First, as we explained above, the use of the term "lasting" was not incorrect and does allow for consideration of the depth of feeling one might need to have for the conviction to be lasting. Second, while jurors' own lack of reasonable doubt may be susceptible to and require a "subjective level of certitude," that doesn't mean the law prohibits courts from defining the term "reasonable doubt." (See *Victor, supra,* 511 U.S. at p. 5 ["the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course"].) Providing jurors with a definition of "reasonable doubt," and (correctly) telling them there is a definition of reasonable doubt that applies statewide does not deprive them of their ability to consider their subjective feelings when deciding if they believe the People have met their burden of proof.

26

## II

### *Dismissal of Jurors During the First Trial*

A.     Additional Background

1.     Release of Juror No. 10

In the first trial, the court repeatedly instructed jurors to not discuss the case before deliberations, not even with each other.

On October 27, 2021, Steven Flores, who had served as a field technician for the Stockton Police Department in the investigation of this case, testified.  When the People asked Flores about his employment status, he responded, "I'm currently unemployed due to the vaccine mandate."

The next morning, it was brought to the court's attention that Juror No. 11 had said she had some concerns about jurors making comments about witnesses.  To begin its investigation into the matter, the court brought in Alternate Juror No. 4, Juror No. 4, and Juror No. 12 one at a time.

Alternate Juror No. 4 and Juror No. 12 both said they had not heard anything when the court asked them if they had heard any of the jurors talking about the case, including about witnesses.  In contrast, Juror No. 4 said she had.

After the court established that the juror whom Juror No. 4 had heard talking about the case was Juror No. 10, the court asked more questions.  According to Juror No. 4, Juror No. 10 had talked about witness testimony in the case more than once.  Juror No. 4 characterized Juror No. 10's actions as coming back "[a]fter every break" and saying "vague things" that "pertains to the trial."  Examples Juror No. 4 offered included a comment by Juror No. 10 that he thought the case was the judge's first trial; a question following testimony about bullets where he asked, " 'well how do we know what type of bullet it is and what type of gun it is?' "  Juror No. 4 said Juror No. 10 made these comments when all the jurors were in the room, and it happened just about every time

27

they returned from a break. Juror No. 4 said that when Juror No. 10 made comments, other jurors did not engage in discussion. The People asked Juror No. 4, "it's not like, oh, gosh, these breaks [are] making us wait all this time. It's like substantive things going on in this trial. Is that fair to say?" Juror No. 4 responded, "[y]es."

Before bringing in a second batch of three jurors—Juror Nos. 11, 1, and 10—the court said it was leaning towards letting Juror No. 10 go, because, he "can't follow the rules repeatedly."

Juror No. 11 reported that Juror No. 10 made "vague" comments almost every time they left the court. As examples, Juror No. 11 said Juror No. 10 had said something in relation to Flores's testimony that he was no longer employed due to the vaccine mandate. Juror No. 11 reported that another juror had responded about how COVID keeps people from having jobs and whether to vaccinate was a personal decision. Juror No. 11 also reported that the prior day Juror No. 10 had commented about how long it was taking to go through the process of discussing the bullets, and the prior week when a witness had needed an interpreter he had said something like, "wow, I hope we don't have to go through that again."

The court asked, "[h]as he said other comments specific to witnesses and the evidence in the case? I'm not talking about gee, it's a little late starting or parking is not good, the elevator got stuck?" Juror No. 11 responded, "[n]o, we all talk about general stuff like that." When asked if others engaged in case specific discussions with Juror No. 10, Juror No. 11 reiterated, "[t]here's no [*sic*] case specific . . . . It's the little digs he does." When the court asked if Juror No. 10 was the only one Juror No. 11 had heard make comments, Juror No. 11 responded, "[h]e's the one that instigates it most of the time."

The People asked questions and clarified that when Juror No. 10 made comments, all the jurors were together.

28

After Juror No. 11 finished answering questions and before the court brought in Juror No. 1, the court said, "I'm probably going to let him go, guys, because it's not working out. One intemperate comment isn't going to kill us, but repeated comments of this type can only lead to more problems and it is a violation of the rule not to talk about the case. Even though we didn't get into anything real specific, it is causing some problems of violating the rule of not speaking about the matter." The court noted that Juror No. 10 "is a nuclear engineer, so this is concerning. MIT graduate. I need him to follow the rules. His dad was a judge. This is not a guy who hasn't had some contact with higher education at the highest level and a family that was in the law. His dad died 23 years ago, but he was 35 when his dad died."

When the court asked Juror No. 1 if he had heard anyone on the jury panel talking about the case in any way, Juror No. 1 said he had not. When the People asked if Juror No. 1 had heard any comments about bullets, guns, or witnesses being vaccinated, Juror No. 1 responded, "[t]here was only one comment that was the witness that said that he was unemployed due to the vaccination mandate. That comment came up once and that was it."

After excusing Juror No. 1 and before bringing in Juror No. 10, the court said, "I think we've talked to a sufficient number of people . . . who are highly responsible and supervisory jobs and big careers. So I'm going to bring [Juror No. 10] in. I'm going to ask him if he's heard anybody talking about the case, because we know what these two jurors say. We'll see what he says. You guys can ask him questions. I'm going to be candid. I'm going to let him go. I can't have that kind of misconduct. It's not egregious in the sense of direct comments about the evidence or advocacy, but it does violate the rules and if you violate the rules at this level, I'm concerned about deliberations, the rest of the case, what other problems a person who can't follow the rules would create and also this is a guy, as I said earlier, with the educational background and family history, dad was a judge, he should know these rules count."

29

The court then brought in Juror No. 10. Juror No. 10 denied (1) hearing anybody making any comments about the witnesses or evidence in the case; (2) anyone saying anything about firearms, bullets, COVID with a witness, or Flores; and (3) hearing anyone discuss the evidence or people involved in the case, "in any way."

When Juror No. 10 left the courtroom, the court and counsel discussed whether to release the juror. Defense counsel argued against removing Juror No. 10, while the People felt removal was warranted.

After hearing from counsel, the court stated, "[w]e've heard from two highly responsible jurors, [Juror No. 11] and [Juror No. 4], about the conduct [Juror No. 10] has engaged. I'm not going to repeat it all, other than to briefly say his comments apparently do involve case evidence, the bullet, the gun, Mr. Flores's COVID situation, whatever it may be. He's been admonished repeatedly in the presence of all of them. I think there's only one time I may have not mentioned the admonition because they've heard them over and over in the weeks we've done this. Admonishing him again I don't think is going to work out. I think he just doesn't get it. If he did, he would follow the rules that we have." The court stated, "[m]y decision is abundance of caution I think he needs to be removed here so we can prevent future violations that could be more serious. I didn't put the question to him. I've done this before. We have sufficient evidence from the other jurors here who basically are unbiased neutral people. They don't have axe to grind. Don't know him. They've been a team in terms of being a jury, but they have no animosity for the man. They are just reporting what he's doing. It's risen to enough concern and it's happened enough that [Juror No. 11] brought it to the attention of the clerk and [Juror No. 4] vouched for it and verified it. The other jurors didn't hear anything. It might be their ears aren't as sensitive to these issues as [Juror No. 11] and [Juror No. 4]. [¶] It's a concern and the necessary one is to remove [Juror No. 10] with our thanks."

30

The court then had Juror No. 10 brought back into the courtroom. When the court explained to Juror No. 10 that it was discharging him from the jury, Juror No. 10 asked, "[i]s it permissible for me to ask why?" The court explained, "[t]here may have been a number of people you made comments about the case. When I say don't talk about the case, that's a real iron clad rule. Some kind of subterfuge on your part. Being silent about the case is a big issue here and something we have to have people take firmly to heart because otherwise it causes significant problems like this situation with you are regrettable. [¶] The lawyers appreciate your time. They thank you for coming down. Given the rules I'm bound by I do have to relieve you. Thank you so much."

### 2.     Release of Juror No. 9

The jury began its deliberations in the first trial on November 9, 2021. The jury was instructed orally, "[d]o not do any research regarding this case on your own or as a group. Do not use, obvious thing, dictionary, internet or any other reference materials. Do not investigate the facts or the law. You have the evidence. This is the law. We don't need to go outside these corners." In reciting this instruction orally, the court stressed this instruction is, "[a]lways an important one on a case." The written instructions also told jurors not to do any research, use the internet, or investigate the law.

On November 12, 2021, the court brought in counsel and defendant and informed them that the foreman, Alternate Juror No. 4, had called the clerk to inform the clerk that someone was possibly doing outside research. The court brought in Alternate Juror No. 4 to ask questions.

Alternate Juror No. 4 said Juror No. 9 had asked a question regarding what would happen if the jury was deadlocked on an issue. Alternate Juror No. 4 said that one juror had said they did not know the answer, and another said maybe that was a question they should ask the judge. Alternate Juror No. 4 then explained that Juror No. 9 indicated he would "handle his question" on his phone, and then Juror No. 9 did, in fact, look up the

31

question. Alternate Juror No. 4 said Juror No. 9 had said that according to his information, someone could be retried for something if there was a deadlock on a count. Alternate Juror No. 4 said Juror No. 9 did this while all the jurors were present, and another juror got very upset and kept repeating that Juror No. 9 could not be doing that. According to Alternate Juror No. 4, Juror No. 9 then said nothing further on the topic, and none of the other jurors engaged in a discussion with him about it.

After Alternate Juror No. 4 exited the courtroom, the court asked counsel for their thoughts, noting that "[i]t's not substantive law in terms of the charges, but it is a violation, so it's misconduct. The issue is how prejudicial is it to anybody here?"

The court addressed the jury as a group, and it explained there may have been some outside research in the case, explained why outside research is not allowed, and reiterated the seriousness of the rule. The court then told the jury it was going to ask each juror (1) if they heard the conversation regarding the research; and (2) if they could disregard what they heard and continue to act as a fair and impartial juror following the rules that the court read to them.

The court excused everyone but Alternate Juror No. 4, and it asked her if she felt that this issue would impair the fairness of anybody or herself. She said she did not believe it would.

The court then brought in the other jurors one at a time, leaving Juror No. 9 for last.

The other jurors all said no research had been performed by another juror that would impact their ability to remain a fair juror.

Juror No. 1 stated Juror No. 1 felt the research performed by a juror was not about the case but more of an effort to get the definition of something. Juror No. 1 could not remember what was looked up. Juror No. 1 confirmed the juror who looked the term up told others the definition after the juror had looked it up.

32

Juror No. 2 said someone looked at their phone and made an advisement regarding if someone could be tried again, and all the jurors were present when a juror did some research on his phone.

Juror No. 4 said it was correct that a juror did some outside research. Juror No. 4 said the person kept repeating what the person had looked up, and that she told the foreperson the person was Googling the issue, which should not have been done. She said the juror who had looked up the information verbalized the information he Googled.

Juror No. 7 did not remember hearing or seeing a juror performing outside research on his phone while the jury was in deliberations and all the jurors were present. However, Juror No. 7 did recall hearing some comment, but did not see any phones or anything. Juror No. 7 believed that Juror No. 9 had said something about how fast a gunshot can travel per second. When the People asked Juror No. 7 questions about if Juror No. 7 had heard anything about what might happen if they could not agree on a charge, Juror No. 7 had heard something to the effect of if they could not agree, "would a new trial be able to take place, kind of range." Juror No. 7 characterized the conversation regarding what would happen if they could not agree on a charge as occurring more "in the background" and "not exactly addressed." Juror No. 7 could not recall if anyone commented back.

With Juror No. 11, the court began by explaining it had been informed a juror had done some research on the case during deliberations in front of all the jurors. The court clarified that the person had brought to the other jurors' attention the topic of whether a person can be retried if the jury can't agree on it. Juror No. 11 said, "[n]ow I know what you're talking about." Juror No. 11 identified Juror No. 9 as a person who had made the comment. She said Juror No. 9 had made some comments before the jury began deliberating. She felt this put everybody else on the defensive. Juror No. 11 could not think of any other issues Juror No. 9 had raised.

33

Juror No. 12 recalled that someone had gone online to look up "hung jury." That person relayed something to the effect of a hung jury would result in a mistrial. Juror No. 12 characterized the matter as "kind of a side conversation." It was the only incident of someone bringing in outside information that Juror No. 12 could recall.

Juror Nos. 5, 6, and 10 did not recall someone doing outside research on their phone when all jurors were present.

After finishing speaking with Juror No. 12, the court noted, "[w]e've got everybody who can remain fair and impartial. Except we haven't talked to [Juror No. 9], the instigator. We know from a number of people here . . . that [Juror No. 9] is doing research on his own, one is the hung jury, the other is bullet speed."

The court asked the People their thoughts on keeping Juror No. 9. The People noted that jurors are repeatedly told not to research anything about the case. The People said that though the topic researched might not have been specific about the case they wanted the juror excused, because they wanted to make sure the jury is fair and impartial.

The court said it was concerned because Juror No. 9 seemed like a forceful individual, and, while the court would not get rid of someone for having strong opinions, it seemed like the juror might go "off the grid" on his own and look up things like bullet speeds and hung jury issues.

The court asked the defense if it had any objection to letting Juror No. 9 go, and defense counsel responded, "[n]o objection. I—just my comment, my only comment would be that I think that—I think a warning would be appropriate if we didn't have the experience with [Juror No. 10] or the Court reminded the jury the importance of not doing these outside things, and so I'll submit." When the court asked if it was okay to release Juror No. 9, defense counsel responded, "[y]es."

Before bringing in Juror No. 9, the court said, "I'm going to release him. This is not a debate. We have a number of other jurors who are quite clear he is the instigator of this. It's not solicited by any other jurors. No, it's not evidence specific in the sense that

34

he's researching People's exhibits, except this bullet speed is a concern because that could be evidence specific. Although we did talk a little bit about speed, but that wasn't a germane factor here. That wasn't an issue.

"The other issue, he's not following the instructions. I'm going to find it's not prejudicial at all with the other jurors. We polled them individually, yes, I'm in for the ride. I can continue to be a fair and impartial person. The person jeopardizing that is [Juror No. 9]. I'm going to excuse him."

The court then brought in Juror No. 9. The court explained, "[i]t's come to light that you may have conducted some outside research on the case."

Juror No. 9 said, "[w]ait a minute. Do I get to defend myself on that?"

The court responded, "[w]ell, you know, I've had enough conversations with others that I don't think we're going to go there at this time."

Juror No. 9 said, "[o]h my goodness. I am totally shocked."

The court said, "I talked to the lawyers and they are both in agreement. When they both agree and I'm of like mind, I think we're going to go ahead. We're going to let you stand down and be excused on the case. There's nothing more I'm going to add and I know they won't either."

Juror No. 9 then asked what he had been accused of, and the court responded, "we're just going to let that go by the boards with our thanks for coming down and you're free to head out."

After Juror No. 9 left, the court noted on the record, "[i]t's always regrettable when we can't let people say their piece. There's a problem when we have a number of jurors, at least a third of the jury saying this guy is doing stuff that's of concern to us. He shouldn't be doing it. . . . Getting an explanation from [Juror No. 9] is not going to cure it. [¶] Again, just a note for the record, yeah, it's misconduct. For him it would be prejudicial in my opinion. The other jurors there is no prejudice."

35

B.   Principles of Law and Review

Under section 1089, "[i]f at any time, whether before or after the final submission of the case to the jury, a juror . . . upon other good cause shown to the court is found to be unable to perform his or her duty . . . the court may order the juror to be discharged and draw the name of an alternate." (§ 1089; see also *People v. Armstrong* (2016) 1 Cal.5th 432, 450.) "Thus, before excusing a seated juror, the trial court must find there is good cause to believe the juror is unable to perform his or her duty." (*People v. Henderson* (2022) 78 Cal.App.5th 530, 556-557 (*Henderson*).)

"[A] juror's serious and wilful [*sic*] misconduct is good cause to believe that the juror will not be able to perform his or her duty." (*People v. Daniels* (1991) 52 Cal.3d 815, 864 (*Daniels*).) "Where . . . the record supplies evidence that a juror cannot be trusted to follow the court's instructions going forward, the court may discharge the juror." (*People v. Peterson* (2020) 10 Cal.5th 409, 474 (*Peterson*).) Indeed, "a court may exercise its discretion to remove a juror for serious and wilful [*sic*] misconduct," as shown by a juror's "repeated violation of the court's instructions, even if this misconduct is 'neutral' as between the parties and does not suggest bias toward either side." (*Daniels*, at pp. 863-864; see also *People v. Flores* (2021) 70 Cal.App.5th 100, 111 ["Not following instructions is itself a form of jury misconduct"]; *People v. Linton* (2013) 56 Cal.4th 1146, 1194 ["A juror who violates his or her oath and the trial court's instructions is guilty of misconduct"]; *People v. Ledesma* (2006) 39 Cal.4th 641, 738 ["In appropriate circumstances a trial judge may conclude, based on a juror's willful failure to follow an instruction, that the juror will not follow other instructions and is therefore unable to perform his or her duty as a juror"].)

"Both the scope of any investigation" into an allegation of juror misconduct "and the ultimate decision whether to discharge a given juror are committed to the sound

discretion of the trial court." (*People v. Romero* (2017) 14 Cal.App.5th 774, 781; *Peterson*, *supra*, 10 Cal.5th at p. 472; *People v. Bowers* (2001) 87 Cal.App.4th 722, 729.)

" ' "In determining whether juror misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " ' (*People v. Linton*, *supra*, 56 Cal.4th at p. 1194; see *People v. Nesler* (1997) 16 Cal.4th 561, 582 [] (plur. opn.).) We will uphold the trial court's decision if the record supports the basis for that decision as a ' "demonstrable reality." ' ([*People v. ]Williams*[ (2015) 61 Cal.4th 1224,] 1262.) This means simply that the record must reveal the reason for the court's decision to discharge a juror and in turn substantial evidence must support that reason. (*People v. Duff* (2014) 58 Cal.4th 527, 560 [].) So long as it does, ' "the court's action will be upheld on appeal." ' ([*People v. ]Sattiewhite*[ (2014) 59 Cal.4th 446,] 486.)" (*Peterson*, *supra*, 10 Cal.5th at pp. 472-473.)

The demonstrable reality test is more comprehensive and less deferential than substantial evidence review. (*People v. Barton* (2020) 56 Cal.App.5th 496, 509 (*Barton*).) " ' "It requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror] was established." ' ([*People v. Fuiava* (2012) 53 Cal.4th 622,] 712.) Under the demonstrable reality standard, reviewing courts 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' ([*People v. ]Barnwell*[ (2007) 41 Cal.4th 1038,] 1053.) In reaching that conclusion, this court considers 'not just the evidence itself, but also the record of reasons the court provides.' (*Ibid.*) The 'heightened' and 'more stringent' demonstrable reality standard 'more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' (*Id.* at p. 1052; see also *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 [].)" (*Barton*, *supra*, 56 Cal.App.5th at p. 509.)

In *Henderson*, *supra*, 78 Cal.App.5th at pages 557-558, this court "distill[ed] the following summary from our high court's explanation of the demonstrable reality test . . . : (1) The demonstrable reality test is a heightened standard requiring a stronger evidentiary showing than the substantial evidence test, which looks at the evidence in a light most favorable to the judgment; (2) however, like the substantial evidence test, reviewing courts do not reweigh the evidence; (3) but a reviewing court must look only to the evidence upon which the trial court actually relied in determining whether the trial court's decision is supported by the evidence; thus reviewing courts may not base their decision on evidence upon which the trial court did not actually rely; (4) in addition to the evidence upon which the trial court relied, a reviewing court must consider the reasons the trial court gives for its ruling; (5) because a reviewing court must consider 'the record of the reasons the trial court provides,' reviewing courts cannot imply findings the trial court did not expressly make; and (6) because a reviewing court cannot imply findings, the trial court should expressly state its reasons for discharging the juror, including demeanor-based reasons and credibility findings. As to this last point, our high court said some time ago: 'A trial court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion . . . In taking the serious step of removing a . . . juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality.' (*People v. Barnwell*[*, supra,*] 41 Cal.4th [at p.] 1053 [] [removal of sitting juror for deliberation misconduct].)"

C.    Analysis of Release of Juror No. 10

The record supports the removal of Juror No. 10 as a demonstrable reality.

"The Penal Code provides that jurors must not 'converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them.' (§ 1122.)" (*In re Hitchings*

38

(1993) 6 Cal.4th 97, 118.) Defendant's jury was so instructed. "Violation of this duty *is serious misconduct*." (*Ibid.*, italics added.)

Here, in explaining its decision to release Juror No. 10, the court noted the other jurors, who the court found credible, had stated that the topics Juror No. 10 included case evidence involving the bullet, the gun, and the "COVID situation." In comments leading up to making its final decision, the court also observed the "repeated" nature of the comments and how they "can only lead to more problems." Substantial evidence, taken from the statements of other jurors, supports these conclusions. Juror No. 4 informed the court that Juror No. 10 had said something about the gun and bullets. Both Juror No. 4 and Juror No. 11 characterized Juror No. 10's comments as repeated. Juror No. 11 reported that Juror No. 10 had made a comment about the Flores's COVID issue, which caused another juror to respond. And Juror No. 1 acknowledged that someone had made a comment about a witness being unemployed due to the vaccine mandate.

Defendant tries to persuade us that Juror No. 10's comments were trivial, and therefore not serious, but we are not persuaded. Here, even if we were to treat one comment taken alone was not serious, collectively, as the trial court discerned, they reflected that Juror No. 10 could not be trusted to follow instructions moving forward, which is grounds to discharge a juror. (See *Peterson*, *supra*, 10 Cal.5th at p. 474.)

Cherry picking language from the trial court's reasoning, defendant says the court removed Juror No. 10 in an "abundance of caution" and recognized that the misconduct was "not egregious in the sense of direct comments about the evidence or advocacy." Defendant argues these phrases suggest the trial court did not find Juror No. 10 committed "serious" misconduct that justifies the removal of the juror. The phrase "abundance of caution" as the trial court used it simply reflects the trial court's understanding that Juror No. 10's misconduct was serious in large part because the repeated violations demonstrated he needed to be removed to prevent future violations that could be more serious. The court's statement regarding how "egregious" these

39

particular comments might have been did not detract from the serious nature of repeated violations of the rule. "[A] court may exercise its discretion to remove a juror for serious and wilful [*sic*] misconduct, such as that shown by [a juror's] repeated violation of the court's instructions." (*Daniels*, *supra*, 52 Cal.3d at pp. 863-864.) Also, that the individual comments were not as egregious as they could have been does not mean the violations of the court's instructions was not serious.

Defendant argues that this record does not demonstrate Juror No. 10's violations were willful, and suggests that perhaps the juror just did not understand the admonition. This argument is unpersuasive. Any possible lack of clarity about this rule was dispelled when, before testimony began, the trial court reminded the jurors of the admonition, explaining, "we can't talk about the case, about *anybody*, *anything* with it. That includes with each other . . . so, the only time is when you're in deliberations and all 12 are present." (Italics added.) The court fairly concluded that as a highly-educated son of a judge, Juror No. 10 ought to have understood the admonition as given and refrained from making repeated comments about things to do with the case.

Defendant also argues that the trial court assumed the worst about Juror No. 10 without affording him the opportunity to speak to the allegations against him. He suggests that because the court did not give Juror No. 10 the opportunity to provide an explanation, the trial court's decision cannot stand. First, we note that while the court may not have asked Juror No. 10 about his own specific conduct, it did ask him if anyone had discussed the topics of guns, bullets, COVID with a witness, or Flores, and Juror No. 10 denied anyone had said anything on those topics. Thus, the trial court did not leave Juror No. 10 without an opportunity to confess he had brought up some of these topics and to explain why.

Second, the cases defendant cites to support his argument that the court needed to provide Juror No. 10 the chance to speak about the violations are inapposite.

40

In *People v. Compton* (1971) 6 Cal.3d 55, 59-60 the court was concerned with whether an alternate juror's comments reflected he found the facts of the case so distasteful that he could not remain unbiased.

*Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 552-553 (*Shanks*) found the removal of a juror for refusal to deliberate was improper when the trial court based its dismissal on only an interview of two jurors who had complained— after 90 minutes of deliberation—that the removed juror refused to deliberate.  It is in this context that the court wrote, "[i]n most instances, the court will interview all of the jurors before deciding whether a juror is unable or unwilling to deliberate.  At a minimum, it must interview more than the complaining jurors.  [Citation.]  It also should interview the alleged problem juror to obtain his or her response to the complaints.  (*People v. Compton*], *supra*,] 6 Cal.3d [at p.] 60 [].)"  (*Shanks*, *supra*, 9 Cal.App.5th at p. 553.)

*People v. Jones* (2020) 50 Cal.App.5th 694, 700-702, and *People v. Barber* (2002) 102 Cal.App.4th 145, 151-152, like *Shanks*, also concerned the trial court's consideration of whether to release a juror for an inability to deliberate.

Here, the court interviewed more than the complaining witnesses and the issue was not whether the juror had an internal bias or was unwilling to deliberate.  The issue was whether Juror No. 10 had violated the instruction to not talk about anything in the case until the jury began its deliberations.  This is an issue that, in comparison to questions regarding bias and unwillingness to deliberate, has less to do with the juror's state of mind and more to do with observable violations of stated instructions.  Three jurors provided information to the court that suggested its admonition to not talk about the case had been violated at least once, and two of those jurors—one who was selected at random—characterized these violations as repeated.  This sort of repeated violation reflects an inability to perform the duties of a juror.  (See *Daniels, supra,* 52 Cal.3d at p. 865.)

41

D.    Analysis of Release of Juror No. 9

The record also supports the removal of Juror No. 9.

The trial court instructed the jury to not do any research, including through use of the internet, on the facts or the law.  The court said this rule was important.

Numerous jurors supplied the court with information that supported a finding that Juror No. 9 used his phone to research a legal question—the impact of a hung jury—and shared what he learned with the other jurors.  The foreperson reported that while this happened, another juror got very upset and kept repeating that Juror No. 9 could not be doing that.  Though Juror No. 7 did not report seeing Juror No. 9 use a phone, Juror No. 7 thought she heard Juror No. 9 make a comment based on outside information or research about the speed a gunshot can travel.

This violation of an "important" instruction, coupled with aspects of Juror No. 9's demeanor that the court had observed, provided the court sufficient information to decide Juror No. 9 could not be trusted to follow the instruction to not perform outside research going forward, and that Juror No. 9 might then use that information and his "forceful" personality to influence other jurors.  Given this, there was no error in excusing Juror No. 9.  (*Peterson*, *supra*, 10 Cal.5th at p. 474.)

Defendant's arguments to convince us the record does not support a finding that this misconduct was serious and willful are not meritorious.  First, defendant suggests the violation was not serious because the information shared was correct and likely something many jurors already knew.  But this argument focuses too much on the impact of the violation on the collective jury and not enough on what Juror No. 9's actions reveal about his ability to perform as a juror.  And his acts reveal he cannot be trusted to follow instructions, including the "important" one to not conduct research on the internet.

Defendant also argues that, because the court did not question Juror No. 9 about the incident before it released him, it lacked the information it needed to determine Juror

No. 9's conduct was willful.  As we did with defendant's similar arguments regarding Juror No. 10, we reject this argument as unpersuasive.  The court spoke with every other juror, and only three were unable to identify anything that suggested the reported incident occurred.  The court's instruction to not go on the internet was not vague.  And, even if bullet speed was not particularly germane to the issues the jury needed to decide here, it was not irrelevant or unrelated to a case involving multiple shootings.  The court had enough information to decide that Juror No. 9 willfully violated the instruction, even without interviewing Juror No. 9.

## III

### *The Conviction for Attempted Robbery*

Defendant argues that there was insufficient evidence to support his conviction for attempted robbery.

### A.     Standard of Review

This court's role in reviewing a challenge to the sufficiency of evidence is limited. (*People v. Smith* (2005) 37 Cal.4th 733, 738.)  We examine the entire record to assess "whether *any* rational trier of fact" could have found defendant guilty beyond a reasonable doubt.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  Thus, "we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]'  [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's

verdict. [Citation.]" (*Ibid.*; see also *People v. Lucero* (2019) 41 Cal.App.5th 370, 414.) "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial." (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

Substantial evidence is that is, "evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *People v. Marshall* (1997) 15 Cal.4th 1, 35.) The testimony of one witness can be sufficient to support a conviction, "unless the testimony is physically impossible or inherently improbable." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*); see also *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.)

B.    Substantial Evidence Supports the Attempted Robbery Verdict

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.)

According to A.T.'s testimony, he was approached outside of the mission by someone who, "wanted something." The guy was, "being a jerk." A.T. testified that when threw water on the man to try to change his mind, the man pulled a gun. A.T. also testified when asked if he could see the gun when he first started talking to the man that, "[h]e pulled a gun and tried to put it in my face right away." A.T. also said, the man had "asked [A.T.] for money right away." AT. testified that as he tried to get away from the man, the man shot a gun, though A.T. did not see him shoot it. A.T. thought the man shot a blank or something because he got hit in the arm but did not have a wound.

44

L.S. testified she heard a gunshot. Duckworth testified that he saw A.T. holding his elbow and complaining about something stinging it. The 9-1-1 call between B.K. and the dispatcher captured A.T. responding to a question regarding if the man shot him by saying, "[h]e tried to and it hit my arm. Did it?" B.K. responded that A.T.'s arm was pretty red.

This evidence is sufficient to support factual findings that defendant approached A.T. and asked for money in a hostile manner, and when A.T. refused and responded defensively, defendant escalated his efforts by putting his gun in A.T.'s face. Then, when A.T. tried to get away, he shot at A.T. This supports a conclusion that defendant was trying to get money from A.T. and was using escalating levels of force to get it. That is, it is sufficient to support a finding that defendant attempted to rob A.T.

Defendant raises various theories that we reject to support his argument that the facts do not support an attempted robbery conviction.

First, he points to B.K.'s testimony that he believed A.T. had a severe mental illness or a developmental disability and argues that (1) the only evidence offered to prove the robbery occurred was A.T.'s testimony; and (2) A.T. was not consistent or credible.

As to the first point, A.T.'s testimony was not the *only* evidence that an attempted robbery had occurred. While he may have been the only direct witness to his interaction with defendant, other evidence corroborates that the gun was fired and either grazed A.T. or was close enough to him to cause him to believe he was hit. As to the second, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Here, A.T.'s testimony made it fairly clear that he did not want to be in court and was reluctant to participate in prosecuting the person who shot at him. In these circumstances, a

45

reasonable jury could give more credence to statements he made suggesting A.T. demanded money and pulled a gun on him than to statements that may have minimized defendant's actions.

Second, defendant raises arguments that, as a practical matter, ask this court to reweigh the evidence. For example, defendant argues that the evidence does not show that defendant demanded anything from A.T. Rather, defendant maintains, all the evidence shows is that defendant "wanted" something, and it is unclear what specifically defendant wanted, or that the request was made in a threatening manner. He argues that—considering the environment where the encounter occurred—the facts suggest defendant was possibly engaged in panhandling or a request for information on how to partake in a meal offered by the mission. Defendant argues that if defendant was seeking food, there is no evidence he believed A.T. had food on his person. As another example, defendant argues that the evidence does not show that defendant was motivated by an intent to steal when he pulled out the gun. Instead, he maintains, the evidence shows that defendant drew his gun after A.T. assaulted defendant by throwing water at him.

But the evidence also allows for the conclusion that defendant wanted money and behaved in an increasingly hostile manner towards A.T. in his efforts to get it. A rational trier of fact could have considered all the evidence, weighed it, and concluded beyond a reasonable doubt that defendant was guilty of attempted robbery.

IV

*Jury Instructions Regarding Assault*

Defendant argues that embellishments the trial court made to the jury instructions for the crime of assault with a firearm resulted in an instructional error. His arguments regarding the instructional error are twofold. First, he argues the embellishments eliminated the actus reus for assault. Second, he argues the court erred in explaining the knowledge element of the offense. We agree with defendant that the instructions as

46

given orally contain embellishments that, when read alone, are misstatements of law. However, given entirety of the instructions, that the jury was provided with a written version of the instructions that did not contain the embellishments, and considering the entire record in this case, we do not find the trial court committed reversible error.

A.    Additional <u>Background</u>

During closing arguments, the People argued regarding the assault charge, "Count 5 is assault with a firearm.  In order to prove defendant guilty, . . . the People must prove that the defendant did an act with a firearm that would directly and probably result in the application of physical—application of force to [A.T.], that the defendant acted willfully, and when the defendant acted he was aware of facts that would directly and probably result in the application of force to someone and the defendant had the present ability to apply force with a firearm.

"What's not required?  The defendant doesn't have to actually touch anyone.  The defendant actually intended to use force against someone when he acted and the defendant's act injured someone.

"If you have a firearm and you point it directly at someone, that is an assault with a firearm.  Period."

The trial court instructed the first jury on the elements necessary to prove a violation of section 245, subdivision (a)(2), assault with a firearm, by using a version of CALCRIM No. 875.  An unembellished written copy was provided to the jury.

In orally delivering the jury instruction for assault with a firearm, the court did not read the instruction verbatim, instead it added and changed some of the language, including inserting some language at the beginning of the instruction.  The court said the following, where the italicized text represents changes from or additions to the written version, except we do not italicize instances where numerals are spelled out or punctuation or capitalization has been changed:

47

"*Now, assault—and I think [the People] mentioned it. Some people think assault means someone has to be injured or hospitalized. An assault as she mentioned, I'm not taking sides, if I was to raise a bat, walk over and raise a bat up high, that's an assault. You don't have to hit somebody or beat somebody with it. In this case they allegedly pointed a weapon, the firearm, at* [A.T.].

"In order to prove a violation of [] section 245(a)(2) as charged in Count 5, each of the following elements must be proved:

"*As we go through this, I want you to think of the example because, you know, without a context, without a factual example, it's a lot of legalese. What are we talking about?*

"Number one, the defendant did an act with a deadly weapon—*in our case the allegation is* a firearm—that by its nature would directly and probably result in the application of force to*wards* a person. *Somebody standing in front of you with a gun or a bat or a knife.*

"Number two, the defendant did that act willfully. Number three, when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone. *With the bat, somebody might get hit.*

"Number four, when the defendant acted he had the present ability to apply force with a deadly weapon, specifically a firearm.

"Someone commits an act willfully when he does it willingly or on purpose. It *does not require to*[1] break the law, hurt someone else or gain any advantage.

---

[1] The written instruction said, "[i]t is not required that he intend to."

"The People are not required to prove that the defendant actually touched someone. The People are not required to prove the[2] defendant actually intended to use force against someone when he acted. No one needs to actually have been injured by defendant's act. However, if someone was injured, you may consider that fact along with all the other evidence in determining whether the defendant committed the assault, and if so, what kind of assault it was.

"Great bodily injury means significant or substantial physical injury. It is an injury greater than minor or moderate harm.

"*Then the firearm definition, we covered that. We have it in here and we said it once and it applies obviously to the one weapon involved here.*"

Also relevant to our analysis is the instruction the court provided the jury for the section 12022.5, subdivision (a), personal use of a firearm enhancement allegation to the assault with a firearm count. That instructions states that someone " 'personally uses a firearm,' . . . if he intentionally does any of the following: [¶] 1. Displayed the firearm in a menacing manner; [¶] 2. Hits someone with the firearm; OR [¶] 3. Fires the firearm." The jury found this enhancement allegation to be true.

B.     Nature of Assault

We outlined the standard of review for instructional error in section I. B. of this discussion.

Section 245, subdivision (a)(2), makes it a punishable offense to "commit[] an assault upon the person of another with a firearm." Pursuant to section 240, "[a]n assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

---

**2** The trial court omitted the word "that" from "prove that the."

49

Though the statutory definition of assault speaks to an "unlawful attempt," (§ 240) and attempt crimes usually require specific intent, "assault is a general intent crime." (*People v. Chance* (2008) 44 Cal.4th 1164, 1167 (*Chance*).) " '[The mens rea for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery.' [Citations.]" (*People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*).) It also requires "actual knowledge of the facts sufficient to establish that the defendant's act by its nature will probably and directly result in injury to another." (*Ibid.*) But "assault does not require a specific intent to injure the victim." (*Id.* at p. 788.) And a defendant "need not be subjectively aware of the risk that a battery might occur." (*Williams*, at p. 788.) Thus, "[a]lthough the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm. [Citation.] The evidence must only demonstrate that the defendant willfully or purposefully attempted a 'violent injury' or 'the least touching,' i.e., 'any wrongful act committed by means of physical force against the person of another.' (*People v. McCoy* (1944) 25 Cal.2d 177, 191 [] . . . .) In other words, '[t]he use of the described force is what counts, not the intent with which same is employed.' [Citation.] Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state." (*People v. Colantuono* (1994) 7 Cal.4th 206, 214-215.) "The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm." (*Id.* at p. 218, fn. omitted.)

The actus reus of assault "is a defendant's action enabling him to inflict a present injury . . . ." (*Chance, supra,* 44 Cal.4th at p. 1172.) "A defendant has a present ability to injure when the ' "defendant has attained the means and location to strike immediately" ' ([*Chance, supra,*] 44 Cal.4th [at p. 1174] []), even if the injury would not

50

'necessarily occur as the very next step in the sequence of events, or without any delay' (*id.* at p. 1172). Thus, 'when a defendant equips and positions himself to carry out a battery, he has the "present ability" required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury.' (*Ibid.*) 'Thus, an assault can occur even when the defendant makes no contact with the victim.' [Citation.]" (*People v. Superior Court (Mendez)* (2022) 86 Cal.App.5th 268, 279.)

First of all, we repeat the admonitions we have set forth earlier regarding the trial court's adlibbing embellishments to the standard jury instructions again pointing out that such embellishments are "perilous."

In assessing the trial court's embellishments here, it is helpful to look at *People v. McMakin* (1857) 8 Cal. 547 (*McMakin*), a seminal case regarding the evidentiary import of drawing, but not firing, a gun and like actions.

In *McMakin, supra,* 8 Cal. at page 547, the defendant drew a gun and threatened to shoot the victim, who was on horseback, if he did not leave some land. Defendant held the gun perpendicular to the victim but pointed it so that the ball would strike the ground first if discharged. (*Ibid.*) The victim rode off and defendant did not shoot. (*Ibid.*) Defendant argued the facts were not sufficient to prove assault. (*Ibid.*) Our Supreme Court disagreed. (See *id.* at p. 549.)

In its analysis, the Court focused on whether the evidence supported a finding that the intention to commit the act was present. (*McMakin, supra,* 8 Cal. at p. 548.) The Court observed that under these facts, "[t]he ability to commit the offense was clear. Holding up a fist in a menacing manner, drawing a sword or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So any other similar act, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault." (*Ibid.*)

51

The Court considered whether an assault could be committed if the evidence showed that the use of the weapon to shoot was conditioned upon the victim not reacting in a way defendant desired to the intimidation effort. (*McMakin, supra,* 8 Cal. at p. 548.) In answering this question, the Court first observed that, "[i]f the prisoner did not intend to use the pistol at all, except for the sole purpose of intimidation, then, it is apprehended, the offense would not have been complete. But when the intent is to go further, if necessary, to accomplish the purpose intended, and preparations are actually made, and weapons drawn, and placed in a position to be instantly used offensively, and with effect, against another, and not in self defense, it would seem to be clear that the offense would be complete. . . . Where a party puts in a condition which must be at once performed, and which condition he has no right to impose, and his intent is immediately to enforce performance by violence, and he places himself in a position to do so, and proceeds as far as it is then necessary for him to go in order to carry out his intention, then it is as much an assault as if he had actually struck, or shot, at the other party, and missed him. It would, indeed, be a great defect in the law, if individuals could be held guiltless under such circumstances." (*Id.* at pp. 548-549.)

In explaining its conclusion that the evidence was sufficient to support a finding of the requisite intent to act, the court stated, "[t]he drawing of a weapon is generally evidence of an intention to use it. Though the drawing itself is evidence of the intent, yet that evidence may be rebutted when the act is accompanied with a declaration, or circumstances, showing no intention to use it. But when the party draws the weapon, although he does not directly point it at the other, but holds it in such a position as enables him to use it before the other party could defend himself, at the same time declaring his determination to use it against the other, the jury are fully warranted in finding that such was his intention." (*McMakin, supra,* 8 Cal. at p. 549.)

C.    Analysis

Defendant maintains that the trial court's error "began" with the court endorsing the People's "oversimplified assertion" that if you point a gun directly at somebody, you have an assault with a firearm, " '[p]eriod' " and then providing its own oversimplified example of an assault when it referred to raising a bat up high as an assault. Defendant argues that these examples only establish brandishing of a weapon under section 417, and not assault. Defendant reasons this is so because without the actus reus of an attempt to use a weapon to commit a violent injury, brandishing a weapon is not an assault.

With respect to defendant's arguments regarding the actus reus of the offense, we are not persuaded the illustrations are incorrect or otherwise caused the jury to misapply the law, particularly when we consider the illustrations as part of the entire charge rather than as isolated parts. (See *People v. Carrington, supra,* 47 Cal.4th at p. 192.) Both the statement regarding pointing a gun and the court's statement regarding holding a bat up high arose in the context of explaining that an actual injury is not required to find there was an assault. And this is true. The act in question need not actually cause an injury. (See § 240; *Mendez*, *supra*, 86 Cal.App.5th at p. 279.)

Furthermore, defendant argues the example regarding the bat is problematic because the hypothetical assailant would need to at least swing the bat and miss to complete the battery. We do not agree. Once the bat is raised high and near a potential victim, the wielder has enabled him or herself to inflict a present injury. (See *Chance*, *supra*, 44 Cal.4th at p. 1172.) To satisfy the actus reus of assault, "[t]here is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay. The *McMakin* court noted that assault does not require a direct attempt at violence. (*McMakin*, *supra*, 8 Cal. at p. 548.) 'There need not be even a direct attempt at violence; but any indirect preparation towards it, under the circumstances mentioned, such as drawing a sword or bayonet, or even laying one's hand

53

upon his sword, would be sufficient.' (*Hays v. The People* (N.Y. Sup.Ct. 1841) 1 Hill 351, 352–353, cited in *McMakin*, at p. 548.)" (*Chance*, *supra*, (2008) 44 Cal.4th at p. 1172.)

We acknowledge that the hypothetical action described was further removed from a present ability to cause harm when the trial court used it in point one of the instruction, and the court qualified the action requirement by saying, "[s]omebody standing in front of you with a gun or a bat or a knife." But, again, given the entirety of the instructions, the jury would not have reasonably applied the statement to determine an act taken could be other than one that would directly and probably result in the application of force to a person as described in case law.

The use of the examples—particularly the one with the bat—is more problematic when we look at them in relation to the mens rea and knowledge requirements for assault. Again, the introduction of the examples did not create an error here because they were offered to explain that no one needs to be injured for an assault to occur. But if divorced from that context, to say raising a bat high near a person is an assault obscures the requirement that there be an intention to perform an act that will probably and directly result in injury to another. (See *Williams*, *supra*, 26 Cal.4th at p. 782.) It ignores that it might be possible for the hypothetical bat-raiser to present evidence to rebut a conclusion they intended to use the bat in a manner that would complete a battery. (See *McMakin*, *supra*, 8 Cal. at p. 549.) Indeed, while "[h]olding up a fist in a *menacing* manner" may provide enough evidence to support a finding of the requisite intent, the hypothetical regarding the bat, without context of why the bat was raised or the milieu in which it was raised, is not "accompanied by such circumstances as denote an intention existing at the time." (*Id.* at p. 548.)

The bat hypothetical also led the court technically to misstate the law when the trial court cross-referenced the hypothetical in giving the point instruction on the knowledge requirement. The trial court said, "[w]ith the bat, somebody *might* get hit."

But "might" is not the requirement. The requirement is that defendant be aware of facts that would lead a reasonable person to realize his act by its nature would *directly and probably* result in the application of force to someone. (*Williams*, *supra*, 26 Cal.4th at p. 782.) Again, looking at the greater context the statement appears in, the jury probably understood that the court only meant that "get[ting] hit" is an example of the type of direct and probable result that is enough to prove assault, even if no one actually gets hit. (See *People v. Carrington, supra,* 47 Cal.4th at p. 192; *People v. Vang, supra,* 171 Cal.App.4th at p. 1129.) That is, a reasonable jury would not look at the instructions as a whole and decide the need for a direct and probable consequence was being reduced to a mere possible consequence. But the fact remains that the safer course of action would have been for the trial court to not embellish the instructions at all.

Thus, the instructions as given with the oral embellishments do contain some statements that, taken alone, do not accurately reflect the law regarding the elements of assault with a firearm. However, when seen as a part of the whole of the instructions and charge, we don't believe the jury misunderstood what it needed to find.

On the off chance the jury would have misunderstood the oral instructions, two more factors would save the assault with a firearm finding from reversal.

First, the written instructions do not contain the embellishments and, in fact, contain correct statements of the law. To the extent one of the trial court's oral embellishments might conflict with the written instructions—e.g., if the jury were to have concluded "might" as used meant something other than and was therefore contradictory to "directly and probably"—we would assume the jury followed the correct written instructions. (See *People v. Grimes, supra,* 1 Cal.5th at p. 729.)

Second, in making a section 12022.5, subdivision (a), truth finding, the jury found defendant intentionally "[d]isplayed the firearm in a menacing manner"; hit someone with the firearm, or "fire[d] the firearm." This finding, "alone may be sufficient to establish assault. (*People v. McMakin*[*, supra,*] 8 Cal. [at p.] 548 [observing that

55

'presenting' a gun at [a] person within its range can constitute assault]; *People v. Laya* (1954) 123 Cal.App.2d 7, 16 [] ['The mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all'].)" (*People v. Rivera* (2019) 7 Cal.5th 306, 333.) Additionally, despite defendant's efforts to characterize A.T.'s injuries as resulting from hitting a corner at the mission as he tried to flee the drawn weapon, this is contrary to the evidence that A.T. was heard on the 9-1-1 call saying the shooter tried to shoot him and it hit his arm, and to A.T.'s testimony indicating he believed the gun had blanks because he "got hit in the arm" but had no wound. Moreover, even if one were to conclude that defendant did not pull the trigger while pointing the gun at A.T. and that A.T.'s elbow hurt because he hit it on some part of the building, A.T. also testified that defendant "pulled a gun and *tried to put it in [A.T.'s] face* right away." Defendant offered no evidence to rebut the assumption that he had the requisite intent required for assault when he pulled the loaded gun and put it in A.T.'s face during their heated encounter. (*McMakin*, *supra*, 8 Cal. at p. 549.) Indeed, pulling a loaded weapon and shoving it in someone's face during a heated encounter is itself highly risky behavior. As a result, any error was harmless beyond a reasonable doubt. (*Rivera*, *supra*, at p. 332.)

V

*Vehicle Taking and Gun Theft Convictions and Punishments*

Defendant argues that because the gun was in the trunk of the car when the car was stolen, the car and gun were stolen in a single act of theft. Therefore, he argues, under the single larceny doctrine he could not be convicted of both the taking of the vehicle under Vehicle Code section 10851, subdivision (a), and the theft of the firearm under section 487, subdivision (d)(2). In a final paragraph to his single-larceny-doctrine argument without a separate heading, defendant also argues—again under the theory that the theft of the vehicle and gun were accomplished in one single act—that section 654

prohibits the imposition of punishment for both of these verdicts. We find the single-larceny argument has not been properly raised and do not consider it. We disagree with the section 654 argument.

With respect to defendant's argument regarding the single larceny doctrine, he has failed to point to where he raised this issue below, and he has not articulated an argument or theory as to why he was not required to raise it. (See Cal. Rules of Court, rules 8.204(a)(1)(C) & 8.360(a).) Additionally, he has failed to articulate a standard of review for considering this argument, and thus has failed to explain how he has satisfied it on this record with his arguments. (See Cal. Rules of Court, rule 8.204(a)(1)(B).) This leaves us with unanswered questions that would frame our analysis of this issue. We do not know when in the trial court proceedings defendant believes an error occurred that led to his final conviction on both counts. We do not know if when the supposed error occurred or became apparent, he raised an appropriate objection or argument seeking to correct it. Consequently, we don't know if he forfeited any argument he might make regarding that error on appeal. "As a general rule, a party who does not raise an argument below forfeits the argument on appeal." (*In re Abram L.* (2013) 219 Cal.App.4th 452, 462.) Defendant has not argued, let alone demonstrated why, the forfeiture rule would not apply here. We will not do defendant's job for him by searching the record, trying to divine where the trial court ought to have acted to prevent the alleged error, identifying the proper standard of review in that context, and then applying it to this record.

Given the way defendant raised his section 654 argument, the argument has also likely been forfeited. An appellant must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B); see *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.) Failure to provide proper headings forfeits issues that may be discussed in the brief but are not

clearly identified by a heading. (See *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 422.) But, even if the argument had not been forfeited, we find it unpersuasive.

"Section 654 precludes multiple punishment for 'a single act or indivisible course of conduct.' (*People v. Assad* (2010) 189 Cal.App.4th 187, 200 [].) ' "The divisibility of a course of conduct depends upon the intent and objective of the defendant. . . . [I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." [Citations.]' (*People v. Akins* (1997) 56 Cal.App.4th 331, 338–339 [].) Whether a defendant harbored multiple criminal objectives is a question of fact, the trial court's determination of which must be upheld on appeal if supported by substantial evidence. (*People v. Nubla* (1999) 74 Cal.App.4th 719, 730 [].)" (*People v. Jones* (2021) 65 Cal.App.5th 1, 12; see also *People v. Carter* (2019) 34 Cal.App.5th 831, 841.)

Here, substantial evidence supports the trial court's implied finding that the taking of the car and the taking of the gun were the result of separate and independent objectives. Based on the testimony of Coffey and McGehee, while the gun may have been in the car at the time the car was stolen, the gun was in the trunk. Thus, at some point, defendant opened the trunk, discovered the gun, loaded it, and decided to keep it and put it to his own use. When he abandoned the car, defendant kept the gun and continued to use it. All this supports a finding that defendant's decision to take the gun and permanently secure it for his own use was not completed in entirely the same action and at the same time as the taking of the car. That is, it supports a finding that he was motivated by a separate objective when he took the gun, and the actions he took to accomplish that objective were not completed at the same time the theft of the car was completed.

Defendant argues that the taking of the gun and car was accomplished with one act, and that when he took the car he intended to take everything in it. Ergo, he reasons, the theft of the car and gun were undeniably accomplished with a single intention and act. The case law defendant cites to support this argument does not do so.

At issue in the cases defendant cites was whether a finding that a defendant committed a theft of a particular item could be supported even though at the time of the established taking of the item the defendant was unaware of the precise nature of what he was stealing, whether that be because defendant did not know a purse contained a gun, a car contained a briefcase, or a victim was carrying a cell phone. (See *People v. DeLeon* (1982) 138 Cal.App.3d 602, 607; *People v. Campbell* (1976) 63 Cal.App.3d 599, 606-607, 614-615; *In re Jesus O.* (2007) 40 Cal.4th 859, 867-868.) They did not consider when evidence of intervening acts could support a finding of separately punishable thefts. Cases are not authority for propositions not considered. (*People v. Fontenot* (2019) 8 Cal.5th 57, 73.)

Though not directly on point, we find this court's decision in *People v. Jones, supra,* 65 Cal.App.5th at page 12, instructive in determining whether to uphold the trial court's sentencing on both the car taking and gun theft counts. In *Jones*, defendant approached the victim and her grandchild with a gun, demanded she give him her phone, then forced her to drive him various places. (*Id.* at pp. 5-6.) Defendant later took over driving, eventually taking the victim to a location where he forced her to orally copulate him. (*Id.* at p. 6.) Afterwards, defendant drove some more, and he finally agreed to let the victim and her grandchild go. (*Ibid.*) Before letting them out of the car, he demanded all the victim's money. (*Ibid.*) Among other findings, defendant was found guilty of two counts of robbery. (*Id.* at p. 4.) On appeal defendant argued the trial court violated section 654 by imposing concurrent sentences for both the robbery counts. (*Ibid.*) We concluded the evidence was "more than sufficient to support the trial court's implied finding that the two robberies were not part of an indivisible course of conduct.

59

*Moreover, even though defendant undoubtedly possessed the same intent, i.e., to permanently deprive [the victim] of her property, when he took both her cell phone and her money, he had time between the robberies to reflect on his actions and renew his intent to steal.*" (*Id.* at p. 12, italics added.) Here too, in removing the gun from the trunk, loading it, and retaining it when he dumped the car, defendant had an opportunity to decide if he was going to leave the gun as part of the car or take it as a separate item. He chose the latter. The trial court's decision to punish him for this separate choice was not in error.

VI

*First Degree Murder Conviction*

Defendant argues his first degree murder conviction must be reversed because there was insufficient evidence to support a finding of premeditation and deliberation. We disagree.

A. <u>Additional</u> <u>Background</u>

The second jury was instructed that defendant was being prosecuted for first degree murder on a theory that the murder was willful, deliberate, and premeditated. The court did not instruct the jury on any other theory of first degree murder.

The defense did not object to admitting the evidence of the incident between the defendant and A.T. at the mission. And defense counsel agreed "one hundred percent" with the court's assessment that it would be "impossible" for the People to agree not to talk about the evidence at the mission "because it's relevant. It shows lots of things. Access to a gun, use of a gun, the same gun . . . that kills Mr. Urbina, the locale." However, the defense did make a motion in limine requesting that the prosecution be barred from mentioning (1) that there was a prior jury trial on facts involved in the second trial; and (2) that defendant was tried and convicted of charges in the other trial.

The trial court agreed that "no one should mention the fact that there was a prior trial or decision on the prior charges."  It also gave a limiting instruction regarding the jury's ability to consider whether the defendant had been prosecuted for those crimes.

### B.  Differentiating Between First and Second Degree Murder

We described the standard of review for sufficiency of evidence claims in section III.A. of this discussion.  We note that under this standard, "[e]ven 'assuming a reasonable jury could have found the evidence did not support premeditation and deliberation and returned a verdict of second degree murder, [defendant's conviction] must stand' " when circumstances reasonably justify the jury's findings.  (*People v. Salazar* (2016) 63 Cal.4th 214, 245 (*Salazar*); see also *People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

The unlawful killing of a human being with malice aforethought is murder. (§ 187, subd. (a).)  Our Legislature has decided to divide murder into two degrees:  first or second.  (See § 189, subds. (a)-(b).)  According to the statutes defining murder, murder is in the first degree if done using certain methods not at issue here; if done during the commission of certain felonies not alleged to have been committed when Urbina was killed; or if it is "willful, deliberate, and premeditated."  (§ 189, subd. (a).)  "All other kinds of murders are of the second degree."  (§ 189, subd. (b).)

A murder verdict based on a finding of willfulness, deliberation, and premeditation requires more than a showing that defendant had an intent to kill.  (*People v. Disa* (2016) 1 Cal.App.5th 654, 664 (*Disa*); *People v. Gomez* (2018) 6 Cal.5th 243, 282 (*Gomez*); *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  " 'In the context of first degree murder, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action' " ' (*People v. Lee* (2011) 51 Cal.4th 620, 636 [])."  (*People v. Smith* (2018) 4 Cal.5th 1134, 1164; *Salazar*, *supra*,

63 Cal.4th at p. 245; *Potts, supra,* 6 Cal.5th at p. 1027.)  Thus, "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse."  (*People v. Stitely* (2005) 35 Cal.4th 514, 543 (*Stitely*); see also *Potts* at p. 1027.)

In considering if there was premeditation and deliberation, " ' " 'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' (*People v. Koontz*[*, supra,*] 27 Cal.4th [at p.] 1080 [], citing *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [].)"  (*Gomez, supra*, 6 Cal.5th at p. 282.)

" 'The legislative definition of the degrees of murder leaves much to the discretion of the jury in many cases.  That discretion, however must have a sound factual basis for its exercise . . . .  [As] is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict. . . .  [The] jury is bound, as are we, to apply the standards fixed by law.  ". . . It is [the jury's] duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion."  [Citation.]' (*People v. Holt*[ (1944)] 25 Cal.2d [59,] 83, 90.)"  (*People v. Anderson* (1968) 70 Cal.2d 15, 23-24 (*Anderson*); *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1265.)

In *Anderson*, *supra*, 70 Cal.2d at page 26 our Supreme Court provided guidance regarding, "[t]he type of evidence . . . sufficient to sustain a finding of premeditation and deliberation."  The Court stated the evidence, "falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result

62

of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27, italics omitted.)

The Court observed, "[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) "Evidence in only one of" the *Anderson* categories, "most often is insufficient." (*People v. Alcala* (1984) 36 Cal.3d 604, 626 (*Alcala*), superseded by statute on other grounds as recognized by *People v. Falsetta* (1999) 21 Cal.4th 903, 911.)

We note, however, that "[t]he *Anderson* factors are not the exclusive means for establishing premeditation and deliberation. (*People v. Perez*[*, supra*] 2 Cal.4th [at p.] 1125 [].)" (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127; *Young, supra,* 34 Cal.4th at p. 1183.) " 'The *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define' " or alter " 'the elements of first degree murder or alter the substantive law of murder in any way.' (*People v. Perez*[*, supra,*] 2 Cal. 4th [at p.] 1125 [].) The *Anderson* guidelines were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." (*People v. Hawkins* (1995) 10 Cal.4th 920, 957 (*Hawkins*); *Disa*, *supra*, 1 Cal.App.5th at p. 665; *People v. Thomas* (1992) 2 Cal.4th 489, 517 (*Thomas*) [*Anderson* "did not refashion the elements of first degree murder or alter the substantive law of murder in any way"].)

The *Anderson* categories are meant to be "descriptive, not normative." (*People v. Davis* (1995) 10 Cal.4th 463, 511; *People v. Elliot* (2005) 37 Cal.4th 453, 470-471

(*Elliot*).)  And " ' "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation."  [Citations.]'  [Citation.]"  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069; *People v. Perez, supra,* 2 Cal.4th at p. 1125.)  Additionally, the *Anderson* factors, "need not be present in any particular combination to find substantial evidence of premeditation and deliberation," (*Stitely*, *supra*, 35 Cal.4th at p. 543; *People v. Booker* (2011) 51 Cal.4th 141, 172), and they need not be "accorded a particular weight" (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332).

    C.  Premeditation and Deliberation Here

Using the *Anderson* factors as a guide, and keeping in mind that "an '[u]nreflective reliance' on *People v. Anderson* is inappropriate" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 202, citing *Thomas*, *supra*, 2 Cal.4th at p. 517), we find that sufficient evidence supports the jury's finding that defendant committed the murder with premeditation and deliberation.  In so doing, we will "vie[w] the evidence in the light most favorable to the judgment."  (See *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 99 (*Lunafelix*).)

We begin with the first factor: planning.  Before arriving at the corner, the defendant slowed down and veered slightly towards the curb in front of the mission, where the next day he would accost A.T., suggesting that as he drove along East Church Street the defendant was looking for a location where he might find a potential victim.  Finding no one, he moved along.  Next, he pulled over, then stopped and got out of the car next to the vacant lot, where Urbina was nearby.  At the time defendant was standing on the curb at the intersection, he had earlier unsealed a bag of ammunition, loaded the gun with at least five shots, and armed himself with the gun.  He then used the gun to shoot Urbina, an unarmed man.  All of this suggests planning by the defendant.

Loading the gun and exiting the car with it strongly suggests that, at a minimum, defendant considered the possibility of violence in advance and possessed some intention to kill if he felt the circumstances warranted it. (*Salazar*, *supra*, 63 Cal.4th at p. 245 [bringing a gun shows evidence of planning]; *Potts*, *supra*, 6 Cal.5th at p. 1027 [arriving at the victims' home with a weapon suggests the murders were planned]; *Young*, *supra*, 34 Cal.4th at p. 1183 [jury could infer from entry into a home with a gun that the defendant considered the possibility of murder in advance and intended to kill even if the murder was committed outside the home]; *Elliot*, *supra*, 37 Cal.4th at p. 471 [arming with a knife before an attack suggests planning]; *People v. Lee, supra,* 51 Cal.4th at p. 636 ["defendant brought a loaded handgun with him on the night [victim] was killed, indicating he had considered the possibility of a violent encounter"]; *People v. Miranda* (1987) 44 Cal.3d 57, 87 (*Miranda*) ["fact that defendant brought his loaded gun into the store and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"]; *People v. Adcox* (1988) 47 Cal.3d 207, 240 (*Adcox*) [bringing a loaded gun and using it to shoot an unarmed victim reasonably suggests that a defendant considered murder in advance]; *People v. Wells* (1988) 199 Cal.App.3d 535, 540-541; *People v. Romero* (2008) 44 Cal.4th 386, 401.)

The timing and location of the murder also factor into our consideration of evidence of planning. The fact that the encounter did not occur earlier in the day, but later in the evening—when it had become dark and the workers who hung out at the corner were more likely to both have finished their socializing and had not yet arrived for their next day's work—suggests defendant planned the encounter for a time when the area would be comparatively isolated. (See *People v. Edwards* (1991) 54 Cal.3d 787, 814 (*Edwards*) [following girls from a campground bathroom to a more remote spot showed planning]; *Elliot*, *supra*, 37 Cal.4th at p. 471 [attack in bar after closing seen as remote and some evidence of planning].) Moreover, the type of persons the defendant

65

was likely to encounter between the mission and the corner at that hour suggests an additional degree of planning. The mission, which defendant appeared to first survey, serves men in crisis who are often suffering addiction. And the lot was a hang out spot for field workers, who, to the extent they would hang out near the lot in evening hours, had often been drinking. The social status of these potential victims and their potential intoxication would render them more vulnerable than the average person, less likely to get involved and report a crime if they did witness it, and less likely to be considered reliable witnesses.

In his reply brief, defendant scoffs at the People's characterization of potential witnesses in the area as " 'inebriates or farm workers' who 'would not make ideal witnesses even if they cooperated with law enforcement.' " While the People's description may be less charitable than deserved, there are valid points to the argument. Any farmworkers in the area at 10 p.m., based on R.M.'s testimony, had likely been hanging out at that hour because they were drinking. Alcohol does impair the senses and one's ability to perceive what is going on. Additionally, there is a fair chance the farmworkers and people who were served by the mission would be less likely to involve themselves in a criminal investigation due to a distrust of law enforcement. This is borne out by the fact that A.T. could not be found to testify and either trial, and his preliminary hearing testimony strongly suggests he did not want to be involved in these proceedings.

Finally, the Country Market videos that show defendant was relatively calm at the market, less than an hour later. That is, he was not so shocked by his actions that he could not go about his evening in a collected manner. (See *People v. Saterfield* (1967) 65 Cal.2d 752, 759 [evidence that a murderer appeared relatively calm at a witness's home shortly after the murder used to support a finding of premeditation and deliberation].)

The defendant makes much of the fact that he did not personally buy the gun, but found it by happenstance in the stolen car. But based on the evidence, when the

66

defendant found the gun, it was unloaded. He was the one who loaded it, and he had to open a sealed a bag of ammunition to do that. He was the one who opted to pull over the car and get out with the gun. That he had only obtained the gun earlier in the day only suggests any plan to use the gun was not made over the course of many days, but possibly only over the course of a few hours. But a few hours, or even minutes, was plenty of time for the defendant to form a plan to use the gun in a deadly encounter. (See *People v. Brady* (2010) 50 Cal.4th 547, 563-564 ["The lack of evidence of extensive planning does not negate a finding of premeditation"; a decision made in a momentary interaction is enough]; *Disa*, *supra*, 1 Cal.App.5th at p. 666 [planning activity occurring over a short period of time is sufficient to find premeditation].) Under these facts, the jury could have reasonably concluded the defendant had decided—that he had planned—before the encounter to use the gun if the interaction unfolded in a particular way.

The evidence regarding the incident at the mission the next day also lends credence to conclusions the other evidence supports regarding planning, and it provides a basis upon which the jury could have logically inferred a motive. In both cases the defendant shot at the person who was walking away from him. It is logical to conclude that in both instances the defendant had planned to approach a weaker victim, demand something, then shoot the victim if the victim refused defendant's demands. (See Evid. Code, § 1101, subd. (b) [allowing the use of other acts to show plan and motive].) While both parties suggest there is very weak evidence of a solid motive here, under these facts the evidence is not non-existent: defendant was motivated to shoot his victims if they did not give him what he wanted. Courts have upheld first degree murder convictions with far more elusive evidence of motive. (See *Edwards*, *supra*, 54 Cal.3d at p. 814 [stating that while the motive was "elusive . . . [a] senseless, random, but premeditated, killing supports a verdict of first degree murder"].) Even a "lack of a discernable rational motive does not preclude a conviction for first degree premeditated murder." (See *People v.*

67

*Whisenhunt, supra,* 44 Cal.4th at p. 202; *Lunafelix*, *supra*, 168 Cal.App.3d at p. 102 [the law does not require a rational motive to support a finding of first degree murder].)

Defendant tries to minimize the import of the fact that he also shot at A.T. by suggesting the real reason he shot A.T. was because A.T. threw water at him, and all this suggests is that defendant was prone to fire his gun when angered. But this overplays the significance of throwing the water and ignores a more significant common characteristic the evidence suggests the two events share: in both cases, the defendant did not shoot the victim while the victim was facing him, but he shot them in the back while they were moving away from him.

This brings us to the third *Anderson* factor: the manner of killing. The evidence supports findings that after he had been out of the car for 50 seconds defendant fired a shot at Urbina as Urbina was walking away from him. At the time, Urbina was approximately 60 feet away from him. That is, even if Urbina and defendant had been engaged in some form of confrontation before the shooting, at least a few seconds had passed before defendant pulled the trigger the first time. Defendant then paused for eight seconds as he walked back towards the car. Then, he fired four more shots. The location of the defect in the fence running along the north side of the empty lot suggests the shots were fired in the direction the defendant would have estimated the victim would have been had he continued walking after the first shot.

This evidence supports a conclusion that the manner of killing reflects premeditation and deliberation. The victim was shot in the back and not during a face-to-face, heated, direct confrontation. (See *Lunafelix*, *supra*, 168 Cal.App.3d at p. 102 ["Throughout the activities prior to the actual shooting, the victim was retreating and posing no threats"]; *Miranda*, *supra*, 44 Cal.3d at p. 87 [Unarmed victims and lack of provocation leads to "an inference that an attack was the result of a deliberate plan rather than a 'rash explosion of violence' "]; *Hawkins*, *supra*, 10 Cal.4th at p. 956 [superficial abrasions consistent with a fall and lack of evidence of a struggle contributed to finding

68

of premeditation and deliberation]; see also *People v. Romero, supra,* 44 Cal.4th at p. 401 [that "defendant brought a gun to the video store where, without any warning or apparent awareness of the impending attack" considered evidence of planning], *Adcox, supra,* 47 Cal.3d at p. 240 ["The manner of killing—a single fatal shot to the back of the head of the unarmed victim from a distance of six to ten feet as he kneeled, baiting his fishhook—further establishes that the shooting was conceived in advance"]; *People v. Brito* (1991) 232 Cal.App.3d 316, 323 ["the manner of the shooting can support an inference of preconceived design since Brito shot his unarmed victim in the back as he was fleeing, which could suggest he had decided ahead of time he would shoot if the victim did not comply with his demands"].)

The defendant did not stop at firing a single shot, but paused and decided to fire four more shots. Both the number of shots and the pause suggest premeditation and deliberation. (*People v. Boyd* (1985) 38 Cal.3d 762, 769-770 ["the deliberate manner in which defendant acted, especially in firing five additional shots at the fleeing and wounded victim, should be sufficient to justify an instruction on premeditation"]; *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing—multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant—is entirely consistent with a premeditated and deliberate murder"]; *Lunafelix, supra,* 168 Cal.App.3d at p. 102 [manner supported premeditation and deliberation when, in part "[t]he victim was disabled by the first one or two shots and his body," then, after a pause, the shooter fired two more shots].) "A theory that a person killed in a fit of rage is undermined by proof that, after ample opportunity for reflection, the person decided that continuing a violent attack was appropriate." (*Potts, supra,* 6 Cal.5th at p. 1029; see also *People v. Streeter* (2012) 54 Cal.4th 205, 244 [murderous acts that occur in "stages" support a finding of premeditation and deliberation].)

That the first shot defendant fired may have been the fatal shot does not change that the subsequent shots reflect a manner of killing in which defendant had considered

the consequences and decided he wanted to make sure Urbina died. "[P]ostmortem conduct can still be probative of a defendant's state of mind before the fatal wounds were inflicted." (*Potts*, *supra*, 6 Cal.5th at p. 1029.) "A reasonable jury could have construed these shots as an ultimately unnecessary coup de grâce to a fatal attack effected with a calculated design to kill." (*Elliot*, *supra*, 37 Cal.4th at p. 471.)

In trying to persuade this court that substantial evidence does not support a finding of premeditation and deliberation, defendant does two things. First, he puts outsized significance on factual differences between this case and other decisions that have applied the *Anderson* factors. Second, he throws out alternative factual scenarios that he suggests the jury could have—or even ought to have—found, functionally asking this court to reweigh the evidence and credibility of witnesses, which we may not do. (*People v. Maury, supra,* 30 Cal.4th at p. 403 [jury has the exclusive province to determine credibility of a witnesses and the truth or falsity of the facts upon which a determination depends].) We briefly provide an example of each argument tactic.

As an example of the first line of argument, the defendant argues that this case is dissimilar to *Alcala*, *supra*, 36 Cal.3d at page 626, which the People cite for the proposition shooting a lone, 83-year-old man, late at night reflects advanced planning. In *Alcala* , the evidence supported findings that the defendant, an adult man, had taken a small 12-year-old girl to a remote mountain ravine and killed her with a knife. (*Id.* at pp. 614-617.) In upholding the first degree murder conviction, the Court reasoned, in part, "when one plans a felony against a far weaker victim, takes her by force or fear to an isolated location, and brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset." (*Id.* at p. 626.) We do not disagree that there are dissimilarities between the facts at issue here and the facts in *Alcala*. But those dissimilarities do not change that the extent the victim (and any other potential victim) here was vulnerable and the extent the location was relatively isolated are relevant for purposes of looking at evidence of planning. All

70

the differences between the two cases suggests is that the impact of the evidence may be less than that of the evidence in *Alcala*. But a lesser degree of persuasiveness does not mean the evidence has no impact or relevance.

As an example of the second line of argument, defendant tries to persuade us that the evidence does not support findings that the area where the shooting occurred was relatively isolated when that even took place. He then uses this assumed set of facts to argue that "it cannot be assumed that Urbina was the target or that the shooting had anything to do with him. Others in the area may have done something to provoke appellant's unconsidered or rash response. Urbina may have been hit by a stray bullet." But the jury could have weighed the evidence, witness credibility, and the seeming strength of witnesses' recollections of events and reasonably concluded that, in fact, others were not around when defendant shot Urbina.

To support his argument that others were around defendant notes that—in addition to the car R.M. and I.M. saw go by them on Church—Z.V. said she saw a car zoom by her on Hunter. But the shooting happened at around 10 p.m. at night, I.M. estimated that he saw the car that went by his home 20 seconds after the gun shots, and Z.V. estimated it was probably "a minute or two" between when she heard the gun shots and saw a car drive by. The jury could easily have placed not much significance on the second car sighting, concluding it was just a car that happened to be driving by.

Next, defendant tries to support his argument that there were other people around by pointing to R.M.'s testimony that she saw and heard others on the corner, and Detective Alaniz's testimony that he heard voices in the background of the Dos Hermanos video with audio. With respect to R.M.'s testimony, she admitted on the stand that she had not previously testified or told police she had seen others. Detective Alaniz said she never told him this. And, with respect to his supposed testimony about hearing voices, Detective Alaniz clarified that "you couldn't distinctly tell that it was words, but you could tell there was something going on outside." Based on all of this, it would have

71

been reasonable to conclude that R.M. was not accurately remembering events of the evening at the time of trial, and the commotion to which Alaniz referred was just the gun shots.

What is more, a finding by the jury that the area was, in fact, relatively isolated—and that R.M.'s recollection was not accurate—is supported by the video and photographic evidence. The videos do not capture anyone walking around. Voices are not captured on the interior video with the audio taken from the time of the shooting. The only discernable type of sound is the hum of restaurant equipment and gun shots.

The jury could have looked at this evidence and reasonably concluded the defendant did not interact with anyone else on the corner. (See *Scott v. Harris* (2007) 550 U.S. 372, 378-381 [declining to view facts in favor of a non-moving party when the parties asserted differing facts on a motion for summary judgment, because there was a video tape capturing events at issue and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals." Also, concluding, "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"].)

Additionally, we note the jury saw exhibits showing an aerial view of the scene of the murder, the location of Urbina's body, the location of I.M.'s and R.M.'s home around a corner a block away from Urbina, and the various foliage and streetlights between where Urbina's body was and the M.s' home. And the jury heard testimony of I.M. and Z.V. regarding how it was dark and hard to see what was happening on the streets that night. Looking at all of this together, the jury could have concluded the chance that R.M. actually saw anyone standing over Urbina's body was extremely low, and she was misremembering events.

72

The evidence here was sufficient to sustain a finding of premeditation and deliberation.

VII

*Correction of the Abstract of Judgment*

The second jury found defendant guilty of first degree murder in violation of section 187, a felony.  The abstract of judgment identifies the crime as "felony murder in the first-degree."  Defendant argues that the use of the term "felony murder" in this context is an error and should be corrected.  The People agree.  We agree the abstract of judgment is not correct.

"The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state.  . . .  First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery."  (*People v. Chun* (2009) 45 Cal.4th 1172, 1182.)  Defendant was not convicted of any of the felonies specified in section 189, nor was he convicted of "felony murder."

The trial court must correct the entry on the abstract of judgment to say "first degree murder."  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time, and appellate courts (including this one) that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts"].)

DISPOSITION

We affirm the judgment. We direct the trial court to correct the abstract of judgement in this case in accordance with our findings in part VII of the Discussion.

_____
HULL, Acting P. J.

We concur:

_____
MESIWALA, J.

_____
WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

74